MORGAN, OLMSTEAD, KENNEDY &
GARDNER, INCORPORATED,
Plaintiff,

v.

FEDERAL INSURANCE
COMPANY, Defendant.

FEDERAL INSURANCE COMPANY,
Third-Party Plaintiff,

v.

Victor SCHIPA (a/k/a Vittorio Schipa), Girard Wilde & Company, Incorporated, Carlisle Institutional Services, Inc., Moseley, Hallgarten, Eastabrook & Weeden, Incorporated, Securities Settlement Corporation, United States Trust Company of New York, and Bruce Hintze, Third-Party Defendants.

No. 84 Civ. 1696 (WCC).

United States District Court,
S.D. New York.

June 20, 1986.

Jacobs Persinger & Parker, New York City, for plaintiff; Irving Parker, Maxwell E. Cox, Joseph E. Gasperetti, of counsel.

Hendler & Murray, P.C., New York City, for defendant; Kenneth W. Malamy, Peter A. Ragone, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

Plaintiff Morgan, Olmstead, Kennedy & Gardner, Incorporated ("Morgan Olmstead") brought this action against Federal Insurance Corporation ("FIC") seeking indemnity under a fidelity bond for losses Morgan Olmstead sustained as a result of the allegedly fraudulent and dishonest acts of one of its employees. This matter is now before the Court on FIC's motion for judgment on the pleadings, or in the alternative for summary judgment, and Morgan Olmstead's cross-motion for summary judgment. For the reasons set forth below, FIC's motion for summary judgment is

granted; [1] I need not and do not address Morgan Olmstead's cross-motion.

*Background*

The parties agree, at least for purposes of these motions, on the following facts; hence, there is no dispute as to any material fact that would prohibit a grant of summary judgment.

Morgan Olmstead is a securities broker-dealer. In 1982, in addition to buying and selling securities, Morgan Olmstead was engaged in the apparently lucrative business of lending securities to other broker-dealers and financial institutions. Morgan Olmstead's stock loan transactions typically worked as follows: Morgan Olmstead would loan stock to a borrower with the understanding that the stock had to be returned upon Morgan Olmstead's demand. In exchange, the borrower would deliver to Morgan Olmstead cash collateral equal to 100% of the market value of the stock at the time of the loan. During the period of the loan, Morgan Olmstead would pay the borrower an agreed rate of interest on the collateral. This interest rate was usually lower than the rate Morgan Olmstead could otherwise obtain from other sources, such as commercial banks. Thus, in this way Morgan Olmstead could obtain funds at a discount to make other investments and to cover its operating costs.

If during the life of a loan the market value of the stock fluctuated, the collateral would be adjusted so that it always equalled 100% of the market value. If the market value rose, Morgan Olmstead would request additional collateral from the borrower. By the same token, if the market value dropped, the borrower would request that Morgan Olmstead return part of its collateral. This process of adjustment is known in the securities industry as "marking to market."

From April 1981 to November 1982, Bruce Hintze ("Hintze") was a vice president of Morgan Olmstead and the manager of its stock loan department. His compen-

---

**1.** Since I have considered affidavits submitted by both parties in familiarizing myself with the factual background of this case, I have treated FIC's motion as one for summary judgment rather than for judgment on the pleadings.

sation was based solely on a profit-sharing formula whereby Morgan Olmstead was to receive 60% and he was to receive 40% of the net profits of the stock loan department. Several expenses were charged against the stock loan department's gross revenues in computing its net profits; among these expenses was the interest paid on cash collateral Morgan Olmstead held on stock loans.

In the summer of 1982, Morgan Olmstead experienced a decline in its stock loan business and the profits of its stock loan department fell accordingly. As a consequence, Hintze's compensation dropped as well. During this period, a stock loan finder [2] named Victor Schipa ("Schipa") approached Hintze and offered to furnish Morgan Olmstead's stock loan department with approximately $20 million of business on the condition that the loans not be marked to market. Hintze agreed to participate in this plan.

Morgan Olmstead alleges that Hintze accepted Schipa's offer in order to increase the profits of the stock loan department and his own compensation under the profit-sharing formula. It contends that Hintze knew that if the stock loaned at Schipa's request increased in value during the life of the loans and the loans were not marked to market, Morgan Olmstead would be required to pay out less interest because the amount of the cash collateral deposited with it would be smaller; consequently, the amount of interest charged against the stock loan department's revenues in computing its net profit would also be smaller. Of necessity, Hintze's income under the profit-sharing formula would be greater.

Morgan Olmstead also contends that Hintze knew that while he would benefit from the undercollateralization of the loans made at Schipa's request, Morgan Olmstead would suffer. Without the full collateral available as operating capital, Morgan Olmstead would borrow additional funds from other sources, such as commercial banks, at substantially higher interest rates. Since the higher cost of such money would not be charged against the revenues of the stock loan department, Hintze's income under the profit-sharing plan would be enhanced. In short, the scheme shifted the expense of paying interest on collateral held as security on stock loans from the stock loan department to Morgan Olmstead's other divisions. This made the stock loan department's net profits appear greater and increased Hintze's compensation under the profit-sharing formula.

Unfortunately for all concerned, Schipa's scheme allegedly did not stop there. Hintze apparently believed that Schipa intended to re-lend the stock he had borrowed from Morgan Olmstead to other borrowers. However, Morgan Olmstead alleges that Schipa instead used the stock for his own benefit to cover short sales he had made. After the stocks had been used in this way, Morgan Olmstead was unable to retrieve them, and since Hintze had directed that the loans not be marked to market, the collateral held by Morgan Olmstead was less than the market value of the stock. Consequently, when Morgan Olmstead was required to purchase replacements on the open market, it suffered a loss of approximately $4 million.

Morgan Olmstead seeks indemnification for this loss under a fidelity bond issued by FIC that covers losses sustained as a result of dishonest acts by Morgan Olmstead's employees. Morgan Olmstead contends that the following provision of the bond covers Hintze's failure to mark the loans requested by Schipa to market:

THIS BOND SHALL COVER LOSSES SUSTAINED BY REASON OF:

1. DISHONESTY COVERAGE

(a) EMPLOYEES: Any dishonest act or acts committed by any Employee for the purpose of making an improper personal

---

**2.** A stock loan finder is a middleman who arranges stock loans between two other parties. Typically, the finder arranges for the stock lender to pay one rate of interest on the collateral it holds on the stock and for the borrower to receive a lower rate of interest on the collateral it delivers in exchange for the stock. The spread between these two rates constitutes the finder's compensation.

financial gain for such Employee, wherever committed and whether committed alone or in collusion with others.

Exhibit A to Complaint at 1. For purposes of this motion, FIC concedes that Hintze was an employee of Morgan Olmstead, that the loss sustained was the result of Hintze's acts, and that Hintze's acts were dishonest. However, FIC argues that Hintze did not commit those acts "for the purpose of making an improper personal financial gain" as that term is defined by the bond. Insuring clause 1(c) states in relevant part:

Salary, commissions, fees or other emoluments, including raises and promotions associated with employment received from the Assured by an Employee, Partner or Processor, shall not constitute improper personal financial gain.

*Id.* The parties agree that the proper construction of this provision is the principal question with respect to FIC's motion for summary judgment.

*Discussion*

Before turning to the merits of the parties' contentions, I take up the issue of which state's law governs this dispute. Morgan Olmstead contends that California law should control, while FIC suggests that either New York or New Jersey law should do so. I find it unnecessary to resolve this question, since the courts of all three jurisdictions apply the same rules in construing insurance contracts.

The courts of all of these states agree that when the terms of an insurance contract are ambiguous or indefinite, the contract should be construed against the insurer and in favor of coverage. *Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 807–08, 640 P.2d 764, 768, 180 Cal.Rptr. 628, 632 (1982) (en banc); *Sparks v. St. Paul Ins. Co.,* 100 N.J. 325, 336, 495 A.2d 406, 412 (1985); *Breed v. Insurance Co. of N. Am.,* 46 N.Y.2d 351, 353, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 354 (1978). However, where the terms of the contract are unambiguous, the courts of these jurisdictions will enforce the contract as written. *St. Paul Fire & Marine Ins. Co. v. Coss,* 80 Cal.

App.3d 888, 896, 145 Cal.Rptr. 836, 841 (2d Dist.1978); *Smith v. Metropolitan Life Ins. Co.,* 29 N.J.Super. 478, 482–83, 102 A.2d 797, 799 (App.Div.1954); *Wells v. Wilbur B. Driver Co.,* 121 N.J.Super. 185, 198, 296 A.2d 352, 359 (Law Div.1972); *Breed,* 46 N.Y.2d at 355, 385 N.E.2d at 1282, 413 N.Y.S.2d at 355. The courts will not indulge in forced or strained constructions to create ambiguities or to cast on an insurer liability that the insurer did not assume. *Pisciotta,* 30 Cal.3d at 807–08, 640 P.2d at 767–68, 180 Cal.Rptr. at 631–32; *Smith,* 29 N.J.Super. at 482, 102 A.2d at 799; *Caporino v. Travelers Ins. Co.,* 62 N.Y.2d 234, 239, 465 N.E.2d 26, 28, 476 N.Y.S.2d 519, 521 (1984). It is for the court to decide whether the terms of the contract are clear and definite on their face. *Continental Cas. Co. v. City of Richmond,* 763 F.2d 1076, 1079 (9th Cir.1985) (applying California law); *Weedo v. Stone-E-Brick, Inc.,* 155 N.J.Super. 474, 479, 382 A.2d 1152, 1155 (App.Div.1977), *rev'd on other grounds,* 81 N.J. 233, 405 A.2d 788 (1979); *Caporino,* 62 N.Y.2d at 239, 465 N.E.2d at 28, 476 N.Y.S.2d at 521.

In my view, the terms of the insurance contract at issue here are unambiguous, and accordingly, there is no need to look beyond their plain meaning. Indeed, although they do not agree on which state's law should govern this case, both parties do agree that the contract is unambiguous and that there is no need to look beyond its terms to determine the scope of coverage. *See* Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment at 11–12; Defendant's Memorandum of Law in Support of Motion for Summary Judgment at 8–9. Therefore, I turn to an examination of the terms of the bond.

As noted above, the bond covers losses caused by "any dishonest act or acts committed by any Employee for the purpose of making an improper personal financial gain for such Employee." FIC does not dispute that Hintze agreed not to mark the loans to market for the purpose of making a personal financial gain for himself. As de-

scribed earlier, by failing to mark the loans to market, Hintze could artificially inflate the profits of the stock loan department and thereby increase his compensation under the profit-sharing arrangement he had with Morgan Olmstead. Yet the question is not merely whether Hintze acted for the purpose of making a personal financial gain, but whether Hintze acted for the purpose of making an improper personal financial gain *as defined by the terms of the bond.*

As also noted above, the bond provides that "[s]alary, commissions, fees or other emoluments, including raises and promotions associated with employment received from the Assured by an Employee, ... shall not constitute improper personal financial gain." FIC contends that the increased compensation Hintze received as a result of inflating the stock loan department's profits was either a commission or "other emolument," and therefore not improper personal financial gain as defined in the bond.

■ I cannot agree with the suggestion that the increased compensation Hintze received was a commission. A commission usually refers to a fee or percentage allowed a salesman on each successful sale or transaction he makes. Hintze's compensation was not based upon the number or size of particular transactions, but the overall profit of the stock loan department. Hintze was entitled to a share of the profits, not commissions *per se.*

■ However, I do agree that Hintze's share of the profits of the stock loan department was an "emolument" within the meaning of the exclusionary clause. Webster's Third New International Dictionary defines emolument as "profit or perquisites from office, employment, or labor." There can be no doubt that Hintze's share of the profits or the stock loan department, even if inflated, was derived from his position as manager of the stock loan department.

Morgan Olmstead objects to this reading of the bond on two principal grounds. First, it argues that the "other emolument"

language of the exclusionary clause should be read narrowly to include only those kinds of compensation specifically mentioned. Invoking the principle *inclusio unius est exclusio alterius,* Morgan Olmstead points out that the exclusionary clause provides that "other emoluments, *including raises and promotions* associated with employment received from the Assured" do not constitute improper personal financial gain. Morgan Olmstead notes that the bond does not say, for example, "other emoluments, including *but not limited to* raises and promotions" are not improper personal financial gain. Morgan Olmstead concludes from this that if the draftsmen had intended a share of profits to fall within the ambit of the clause along with raises and promotions, they would have expressly said so.

■ However, in making this argument, Morgan Olmstead has ignored a principle at least equally fundamental—that a contract should be construed so as to give meaning to each of its terms. If the exclusionary clause encompassed only those kinds of compensation specifically mentioned, the draftsmen would have had no reason to place the generic term "other emoluments" before the words "raises and promotions." Instead, they could have drafted the clause to read simply "salary, commissions, fees, raises and promotions ... shall not constitute improper personal financial gain." But the clause does not read that way, and the draftsmen presumably had some purpose in placing the words "other emoluments" in the clause. The only reasonable explanation is that they intended to make clear that in addition to salary, commissions, and fees, other compensation received by an employee from the insured does not constitute improper personal financial gain. In other words, raises and promotions are examples, but not an exclusive list, of the types of compensation received by an employee that is not considered improper personal financial gain.

Morgan Olmstead's second objection is that even if a share of profits ordinarily

falls within the phrase "other emoluments," an artificially inflated share of profits obtained by fraudulent and dishonest acts does not. In support of this argument, Morgan Olmstead points out that even FIC concedes that if Hintze had received a cash bribe from Schipa, that would clearly constitute an improper personal financial gain within the meaning of the bond. Morgan Olmstead contends that Schipa's offer to bring $20 million in stock loan business to Hintze's department was also a bribe, even though no cash passed directly from Schipa to Hintze.

■ At the outset, I note that it appears to matter little whether one calls the arrangement between Schipa and Hintze a "bribe" or not. The bond does not use the term "bribe," and calling the alleged agreement a bribe does not automatically put it within the coverage of the bond. Likewise, concluding that it was not a bribe does not automatically remove it from coverage.

In any event, there is an important difference between the hypothetical cash bribe scenario that FIC concedes would be covered by the bond and the arrangement that Morgan Olmstead alleges existed between Schipa and Hintze. If Hintze had accepted a cash bribe from Schipa, there would be no question that he was acting for the purpose of making an "improper personal financial gain" within the meaning of the bond. Obviously, money received from Schipa could not be said to be part of Hintze's "salary, commissions, fees or other emoluments"; the exclusionary clause removes only compensation that an employee receives *from the insured* from the category of improper personal financial gain.

■ However, under the arrangement that allegedly existed between Schipa and Hintze, no money or other thing of value actually passed from Schipa to Hintze. Instead, Schipa brought his stock loan business to Morgan Olmstead, and Morgan Olmstead paid Hintze a share of what it

believed were the profits of the stock loan department. In view of Hintze's apparent belief that he would benefit from the scheme, Schipa's offer to bring business to Hintze's department might be loosely termed a "bribe." But since the money Hintze received came from his employer and not from Schipa, Morgan Olmstead gains little by pointing out that the hypothetical cash bribe scenario discussed above falls within the bond's coverage.

■ In any case, Morgan Olmstead's contention is that only "honestly earned" salary, commissions, fees or other emoluments should not be considered improper personal financial gain. However, two factors call this position into doubt. First, there is no language in the bond itself that suggests that the draftsmen intended to impose such a limitation. Second, in construing similar fidelity bond provisions, other courts have rejected similar arguments.[3]

For example, in *Verex Assurance, Inc. v. Gate City Mortgage Co.*, No. C–83–0506W (D.Utah Dec. 4, 1984), a mortgage company contended that it was entitled to recover under a fidelity bond losses arising from the fraudulent acts of three of its former loan officers. The loan officers had concocted a scheme to make loans to uncreditworthy applicants in order to collect the commissions on those loans. To ensure that the loans were made, the loan officers falsified information on the application forms.

The terms of the bond were not identical to those of the bond at issue in this case, but they were similar. The bond provided that

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:

(a) to cause the Insured to sustain such loss; and

---

**3.** Neither the parties nor the Court has unearthed any cases construing the precise bond provisions at issue here.

(b) to obtain financial benefit for the Employee ... other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

Under Morgan Olmstead's theory, the bond would cover the mortgage company's losses because the loan officers' commissions were not "honestly earned." But the court disagreed. It stated:

In order to constitute fraudulent acts within the meaning of [the bond], there must be a manifest intent by the employee to procure some sort of financial benefit other than salary, commissions, or similar benefits. There is no such evidence here. Instead, the evidence and allegations show that the loan officers engaged in the scheme in order to obtain commissions on the allegedly improper loans.

Slip op. at 4.

Similarly, in *Berger v. Fireman's American Loss Control Co.*, No. 508 (Md.Ct. Spec.App. Dec. 16, 1982), an automobile leasing company sought to recover under a fidelity bond losses it had incurred as a result of the fraudulent actions of one of its salesmen. The salesman had misrepresented to the leasing company that he had obtained lease agreements for over 150 cars, and based on that misrepresentation, the leasing company had paid the salesman an advance against future commissions.

The bond contained the same provisions as the one in *Verex*. In an argument similar to Morgan Olmstead's position here, the leasing company argued the bond covered its losses because the commissions the salesman received were "not earned in the normal course of employment." Slip op. at 3. The leasing company contended that since the commissions it had paid to its salesman were not *earned* at all, they obviously could not be earned in the "normal course of employment." *Id.* at 4. The court disagreed with this construction, and held that the bond "clearly and unambiguously excludes from coverage the acts of an employee who fraudulently or dishonestly obtains salary or commissions." *Id.* Since the language of the bond at issue in *Verex* and *Berger* is not identical to the language of the bond in question here, these cases are not conclusive. Nonetheless, they provide persuasive support for the construction that FIC proffers.[4]

*Conclusion*

In sum, I see no compelling reason to disregard the clear language of the bond that salary, commissions, fees or other emoluments, whether honestly or dishonestly earned, do not constitute improper personal financial gain. For this reason, FIC's motion for summary judgment is granted. I need not and do not address Morgan Olmstead's cross-motion for summary judgment. The Clerk of the Court is directed to enter judgment in favor of FIC and to dismiss FIC's third-party complaint against the various third-party defendants.

SO ORDERED.

---

**4.** In addition to *Verex* and *Berger,* FIC cites *Benchmark Crafters, Inc. v. Northwestern Nat'l Ins. Co.,* 363 N.W.2d 89 (Minn.Ct.App.1985), and *Mortell v. Insurance Co. of N. Am.,* 120 Ill. App.3d 1016, 76 Ill.Dec. 268, 458 N.E.2d 922 (1983), to support its reading of the bond provisions. While these cases may contain some language that supports FIC's position, there are important factual distinctions between them and the instant case. For example, Morgan Olmstead alleges that Hintze committed his alleged misdeeds in order to increase his share of the profits of the stock loan department. In *Benchmark Crafters,* however, it is not clear that the insured's employee committed the alleged fraud in order to increase his compensation, since all he received was his regular salary. Similarly, Hintze's scheme was allegedly calculated to defraud his employer, Morgan Olmstead. But in *Mortell,* the wrongdoers were alleged to have misled the insured's customers, not their employer. Accordingly, I believe that these cases are of little precedential value and I have not relied on them in reaching my conclusions about the scope of the bond at issue here.