## FEDERAL DEPOSIT INSURANCE CORPORATION

v.

## ST. PAUL FIRE AND MARINE INSURANCE COMPANY.

### No. 3–86–0346–N.

United States District Court, M.D. Tennessee, Nashville Division.

May 2, 1990.

William R. Obryan, Jr., Nashville, Tenn., for plaintiff.

Roger Milam, Nashville, Tenn., for defendant.

## MEMORANDUM

JOHN T. NIXON, District Judge.

The Farmers Bank and Trust Company (hereinafter "FBT") operated in the town

of Winchester, Tennessee until the bank was closed pursuant to the order of the Commissioner of Banking for the State of Tennessee on January 6, 1984. Upon the bank's closure, the plaintiff Federal Deposit Insurance Corporation (hereinafter "FDIC") assumed receivership over all of FBT's claims, assets and causes of action, and, in its corporate capacity, purchased certain assets of FBT, including FBT's rights under a Bankers Blanket Bond issued by the defendant St. Paul Fire and Marine Insurance Company (hereinafter "St. Paul"). The Blanket Bond is an insurance policy under which St. Paul agreed to indemnify FBT for losses resulting from burglary, robbery, forged securities, employee dishonesty, and other specified eventualities.

As FBT's assignee under the Blanket Bond, the FDIC presented St. Paul with four claims for indemnification, and St. Paul denied all four claims. The FDIC subsequently filed the above-styled action in this Court claiming that St. Paul had breached its obligations under the Blanket Bond by failing to pay on the four claims. This action was tried without a jury on March 28, 29, 30, 31, 1988. Pursuant to Federal Rule of Civil Procedure 52, the Court hereby issues the following Findings of Fact and Conclusions of Law in resolution of this dispute.

## FINDINGS OF FACT

The Farmers Bank and Trust Company was owned in its entirety by Farmbanc Company, a stock holding company specifically created to hold only the stock of FBT. Ownership in Farmbanc Company was represented by 60,000 shares of outstanding stock. Between January, 1982 and January, 1983, ownership of the 60,000 shares of Farmbanc stock was divided among Millard Oakley, Travis Anderson, Billy Mac Welch, Franklin Glass, Gary Ramsey, Ramsey's father, and Ramsey's father-in-law. In January, 1983, Jake Cantrell and Russell McGee also purchased blocks of Farmbanc stock.

In 1982, FBT's Board of Directors consisted of fifteen directors with equal voting power, of whom only Gary Ramsey was a Farmbanc stockholder. The minutes of the FBT Board meetings indicate that the FBT Board of Directors actively reviewed and exercised its authority to approve and disapprove of the bank's policies, loans, investments, appointments, salaries and operations. The minutes further indicate that the Board took special consideration and voted separately on every loan proposed to be made to individuals or businesses in which a director had an interest, and that it was the practice for a director to abstain from voting on loans in which he had a personal interest.

On June 2, 1980, FBT's Board of Directors elected Gary Ramsey to be President and Chief Executive Officer of the bank and to serve as a director on the bank's Board. At their June 16, 1980 meeting, the Board set Ramsey's salary at $50,000 per year. When salaries were next considered, on May 26, 1981, the Board made no changes in any of the officers' salaries. In September of 1983, the Board set the salary of Ramsey's successor as Chief Executive Officer, Thomas Mottern, at $75,000 per year.

One of the FDIC's claims under the Blanket Bond concerns a promissory note issued to FBT from the Bull Run Oil Company. The Bull Run Oil Company was an Amoco oil jobbership incorporated in the State of Tennessee. Jake Butcher was the Chairman of the Board of Bull Run Oil Company, W. Dwight Church was the Company's President, and Sonya Butcher was its Secretary. On March 31, 1977, the Bull Run Oil Company executed a promissory note payable to FBT in the amount of $1,342,000. The promissory note payable to FBT was unsecured but accompanied by personal guarantees purportedly signed by Jake and Sonya Butcher. FBT retained $300,000 of the Bull Run indebtedness and sold the remainder of the loan to five other banks.

Pursuant to their regulatory authority, FDIC examiners reviewed the accounts of the Farmers Bank and Trust on April 4, 1983. During that examination, the FDIC classified the Bull Run loan as a lost ac-

count due to the collapse of Jake Butcher's banking empire and the deterioration of his assets. The loan went into default on July 1, 1983 and no payments were made on it thereafter.

On September 8, 1983, an involuntary bankruptcy petition was filed against Sonya Butcher. Jake Butcher was also the subject of bankruptcy proceedings at that time. In her bankruptcy case, Sonya Butcher asserted that she had not signed the personal guarantee for the Bull Run loan and that she had no knowledge of the loan's existence until the bankruptcy claim had been brought against her. After Mrs. Butcher asserted that her signature had been forged on the Bull Run guarantee, the FDIC, as assignee of the note, dropped its claim against her and filed for recovery under the forgery provision of the FBT— St. Paul Blanket Bond. By that time, both Jake and Sonya Butcher had been declared bankrupt. Unsecured creditors, such as the FDIC, expected to recover less than five percent of the amounts that they were owed from the Butchers' estates.

In deposition testimony entered into evidence in the present case, Sonya Butcher testified that she had difficulty recalling the details of her activities at the time that the personal guarantee was executed in March, 1977. Mrs. Butcher testified that several people in her employ were authorized to sign her name to checks and letters, but that she didn't recall anyone signing her name to bank notes and that she didn't recall having authorized anyone to sign her name to the Bull Run guarantee. She testified that she would have signed the Bull Run note if her husband had asked her to do so. As of March 1988, the outstanding indebtedness on the Bull Run note totalled $805,216 in principal and $431,176 in interest.

The FDIC also submitted a claim for indemnification under the Blanket Bond for FBT's payment of $70,666.70 to Consolidated Financial Service (hereinafter "CFS"). CFS provided consulting services to banks regarding marketing and insurance programs. Jake Cantrell served as the Chairman of the Board of CFS and set the company's policy. CFS's operations were supervised by its President, Russell McGee. CFS was affiliated with the Rhea Bancshares holding company and the stockholders of Rhea Bancshares were automatically given ownership interests in CFS of equal proportion to their interests in the Rhea stock.

Beginning July 1, 1982, CFS received ten monthly payments of $1,666.67 from Farmers Bank and Trust. The Court finds that CFS rendered legitimate consulting services to FBT for the $1,666.67 payments. Among the services provided for these fees, CFS established several marketing programs for FBT, restructured FBT's credit life insurance programs, analyzed FBT's general insurance program, and advised FBT as to their potential liability under certain promotional campaigns. The fee arrangement was never evidenced by a written contract, but was informally agreed to by CFS Chairman Jake Cantrell and FBT President Gary Ramsey.

Apart from the ten monthly payments of $1,666.67, FBT also issued three other checks to CFS on January 4, 1982, July 13, 1982, and January 17, 1983, each in the amount of $18,000. The checks were ordered and authorized by FBT President Ramsey. The $18,000 checks were not sent to CFS President McGee as the $1,666.67 consulting checks had been, but were instead personally given by Ramsey to Cantrell, who used the proceeds to service his personal debts. Part of the monies paid by FBT to CFS were also used to purchase a life insurance policy for Gary Ramsey.

In November, 1982, FBT President Gary Ramsey became a stockholder in CFS and Rhea Bancshares. The other FBT Directors were unaware of Ramsey's interest in CFS. The FBT Directors were also unaware of the $1,666.67 monthly consulting payments and the $18,000 checks paid to CFS. The payments had been included without explanation under the "fees" category in the monthly financial statement reviewed by the Board. Moreover, CFS President McGee was also unaware of the three $18,000 checks issued to CFS and knew of no services that his company had

performed to merit the $18,000 payments. According to the deposition testimony of Gary Ramsey, neither CFS nor Jake Cantrell performed any services to justify the $18,000 payments. Ramsey authorized the payments because he was personally and financially indebted to Cantrell. Ramsey intended to keep the FBT Board of Directors unaware of the CFS payments. Upon becoming apprised of the CFS payments and Ramsey's CFS interest through a report presented by the FDIC in May of 1983, the FBT Board cancelled all future payments to CFS.

The CFS payments constituted part of the basis on which Gary Ramsey was indicted and pled guilty in 1987 to conspiring with Jake Cantrell to willfully misapply the money of FBT with the intent to injure and defraud FBT in violation of 18 U.S.C. § 371 and 18 U.S.C. § 372. The criminal charge against Ramsey was also based on his receipt of $170,000 under the guise of "executive committee fees."

The $170,000 paid to Ramsey as "executive committee fees" was also the subject of one of the FDIC's claims under the Blanket Bond. Ramsey had ordered FBT's controller, Robert Marion Anderton, to issue cashier's checks to Ramsey in the amount of $10,000 every month, beginning January, 1982. Ramsey told Anderton that the checks were for "executive committee fees." Upon Ramsey's installment as President in 1980, Anderton had been told to follow Ramsey's instructions without question. Accordingly, Anderton issued the $10,000 checks in the process of paying the bank bills without knowing any details of the purpose of the payments. Anderton entered the $10,000 payments in the bank's ledger books, and the payments were combined with other expenses on the bank's Income and Expense Statement under the heading "Expense—Fees". The checks were not entered under the separate expense category titled "Expense—Salaries." Ramsey deposited the $10,000 checks in his personal account at the Citizens & Southern National Bank in Atlanta, Georgia. After depositing a check each month, Ramsey would then write a personal check on his account to Jake Cantrell for $5,000.

Both Ramsey and Cantrell used their halves of the $10,000 payments to service the debts that they had incurred in purchasing the stock and options of Farmbanc, Inc.

In his deposition testimony, Ramsey admitted that he purposely concealed the "executive committee fees" from the FBT Board of Directors. Ramsey also admitted that he was the entire "executive committee" and that he performed no services for the bank beyond those for which he was compensated as bank President. The FBT Directors testified that they were unaware of the funds which Ramsey was drawing as "executive committee fees" until the $10,000 checks were brought to the Board's attention by the May, 1983 FDIC report. At that time, the Board voted to discontinue the fee payments.

Two of FBT's officers, Robert Marion Anderton and Eunetta Carmack, were aware of the CFS and "executive committee" payments at the time that the payments were made. Eunetta Carmack was an administrative vice-president of FBT who was responsible for receiving vendor invoices, preparing checks, and presenting the checks and invoices to the appropriate bank officers for authorization and signature. Carmack received many of the invoices for the CFS payments not by mail, but directly from Gary Ramsey. Carmack then presented the CFS invoices to Ramsey or Robert Marion Anderton for authorization, and checks payable to CFS were then prepared by Carmack and signed by Ramsey or Anderton. It was not Carmack's duty to examine the underlying validity of the invoices. Anderton, as FBT controller and vice-president, authorized and signed the CFS and "executive committee fee" checks upon the orders of Ramsey without investigation into the legitimacy of the payments. Carmack testified that she did not know that Ramsey was acting dishonestly by receiving the payments. Anderton considered Ramsey's actions to be "unusual", but not dishonest.

The FDIC also presented a claim under the Blanket Bond for losses which FBT incurred upon the default of several loans

made by Gary Ramsey. The largest concentration of these loans were made for the purchase of Rhea Bancshares stock by Walter Spiva, Thomas C. Parsons, Alfred H. Cowley Jr., and James H. Cowart. The Cowart loan never went into default and is not at issue in this case. Rhea Bancshares had been formed in November, 1979 as a one bank holding company owning title to all of the common stock of Dayton Bank and Trust (hereinafter "DBT"). As of December 31, 1980, Jake Cantrell, Franklin E. Glass, Jr., Billy Mac Welch, James F. Waterhouse, Billy R. Houston, C.P. Swafford, and T. Jack Robinson each owned 10,000 of the 70,000 outstanding shares of Rhea Bancshares. The shares of Swafford, Robinson and Houston were subsequently redeemed, and stock dividends were issued. As of September 1982, there were 100,000 shares of outstanding Rhea Bancshares stock, and Cantrell, Welch, Glass and Waterhouse each owned 25,000 of those shares. Rhea Bancshares had incurred substantial debts in redeeming the stock of original shareholders Swafford, Robinson, and Houston. To satisfy its debts and to increase its operating capital, Rhea Bancshares sought to raise $3,000,000 by issuing 60,000 new shares of its stock at $50 per share.

Gary Ramsey was extensively involved with the operations, affiliated companies, and stockholders of Rhea Bancshares. In 1978, Ramsey was hired by DBT President Jake Cantrell to work as a loan officer at Dayton Bank & Trust. When Cantrell and his associates formed Rhea Bancshares in 1979, Ramsey was promoted to the position of executive vice-president of DBT. In 1980, Cantrell obtained an option to purchase the Farmbanc shares of Willard Oakley, at which time he arranged for Ramsey to leave DBT and take up the position of President at Farmers Bank & Trust. In March, 1982, while still serving as President of Farmers Bank & Trust, Ramsey was elected President of Rhea Bancshares.

On November 2, 1982, Gary Ramsey invested $500,000 in Rhea Bancshares in return for 10,000 shares of Rhea Bancshares stock. To further the success of his investment, Ramsey loaned FBT funds to Alfred Cowley, Thomas Parsons, and Walter Spiva to finance the purchase of the remaining shares of the Rhea stock issue.

Alfred H. Cowley originally financed his purchase of Rhea Bancshares stock through a loan of $750,000 from the Bank of Cummings, Georgia. On October 28, 1982, Gary Ramsey arranged for FBT to purchase a $495,000 participation in Cowley's $750,000 loan. The original loan and FBT participation were unsecured until 20,000 shares of Rhea stock were pledged as collateral for the participation during the FDIC's examination of FBT's books in the Spring of 1983. FBT files contained an unverified August, 1982 financial statement for Cowley listing his net worth at 7 million dollars, and an unverified November 1982 statement listing his net worth at 12 million dollars, without explanation of the drastic increase. In his deposition testimony, Ramsey later admitted that he hadn't known enough about Cowley to justify the purchase of the loan participation, but had arranged the participation at the insistence of Jake Cantrell.

On November 1, 1982, FBT loaned $250,000 to Thomas C. Parsons to purchase 5,000 shares of Rhea Bancshares stock. The loan was extended by FBT President Ramsey and collateralized by the 5,000 shares of Rhea Bancshares stock that Parsons was to purchase. Parsons' unverified financial statement indicated that he had an annual income of approximately $110,000 and net worth of approximately $260,000. Parsons testified that, at the time that he signed the $250,000 note, he did not believe that his finances were sufficient to service the annual principal and interest payments. He accepted the loan, however, on behalf of his friend Ellis Galyon and with the written assurance that Galyon would make all the debt service payments on the $250,000 loan. Galyon was an old friend of Rhea Bancshares Chairman Jake Cantrell and had desired to personally participate in the stock issue but was too highly leveraged through other investments to obtain a $250,000 loan on his own behalf. Prior to execution of the $250,000 note, the

most money Parsons had ever borrowed from FBT was $17,000.

On November 4, 1982, FBT loaned $250,000 to Walter Spiva to purchase 5,000 shares of Rhea Bancshares stock. The loan was extended by Ramsey and collateralized by the 5,000 shares of stock. Spiva earned $40,000 per year as President and Chief Executive Officer of Dayton Bank & Trust. At the time of the loan, Spiva's most recent financial statement indicated that he had a net worth of $73,427. The $250,000 loan required service payment of $50,000 per year.

Ramsey prepared a memorandum to the bank's credit file in regard to the Spiva loan. The memorandum noted that Dayton Bank & Trust was a subsidiary of Rhea Bancshares and that

An ownership interest in Consolidated Financial Services, Rhea Insurance & Dayton Insurance Company is included with the purchase of the holding company stock.... The source of [Spiva's] repayment will be derived from dividends from the insurance & services & companies & bonuses from [Dayton Bank & Trust]. The dividends may also be available from the bank as the banks [sic] income improves since the one bank holding company [Rhea Bancshares] loan at C & S [Citizens & Southern Bank] in Atlanta is paid ahead four years.

The statement that the Rhea Bancshares debt to Citizens & Southern Bank had been "paid ahead four years" was incorrect. Rhea Bancshares defaulted on the loan in early 1984 and lost ownership of Dayton Bank & Trust in the resulting foreclosure.

The FBT Board members testified that Ramsey never revealed his interest in Rhea Bancshares to the FBT Board and that they were unaware that he held such an interest at the time the loans were made. Furthermore, when the Cowley, Parsons, and Spiva loans were presented to the FBT Board on November 15, 1982, Ramsey indicated to the Board that the book value of the Rhea stock offered as collateral was $50 per share. The book value of the Rhea stock was actually $12.28 per share at that time and $26.43 per share after the loan

proceeds were invested in the stock issue. The book value never approached the $50 level which Ramsey indicated to the Board.

The loan policy in effect for Farmers Bank and Trust at the time of the Rhea loans stated that "[l]oan officers shall not process loans to borrowers in which they have a financial interest." The policy further states that "[l]oans to borrowers in which officers of the bank are financially interested shall ... be approved by the Board of Directors." Furthermore, as noted earlier, the FBT Board minutes indicate that directors were required to abstain from voting on loans for entities in which they had an interest and that such loans were specially considered by the Board of Directors. The Parsons, Cowley, and Spiva loans were all processed by Gary Ramsey. All of the loans were extended by Ramsey without prior Board approval. Furthermore, the loans were not presented to the Board for special consideration as loans in which a director had an interest, and Ramsey did not abstain from voting on the loans when they were presented to the Board for subsequent ratification. After the default of the Parsons, Cowley and Spiva loans, the FDIC, as FBT's assignee, filed a claim under the employee dishonesty clause of the St. Paul Blanket Bond.

The FDIC also presented a Blanket Bond claim for money lost due to the default of loans made to Billy Mac Welch and Franklin Glass for the benefit of the Century Motors Company. The Century Motors Company had 200 shares of outstanding stock. Fifty of those shares were owned by Century's operating manager, Bob Littleton. The other 150 shares were held by Franklin Glass on behalf of himself, Billy Mac Welch, Jake Cantrell, and Gary Ramsey pursuant to a written agreement. Cantrell, Welch, and Ramsey remained as unofficial, silent partners to avoid appearances of conflict with their positions at FBT and the Dayton Bank & Trust. Ramsey paid $15,000 for his ownership interest in 37.5 shares of Century Motors' stock.

The operations of Century Motors had been partially financed by a $300,000 loan from the Dayton Bank & Trust. In early

1983, Cantrell, Ramsey, Welch, Glass and Littleton each agreed to contribute $62,000 for the retirement of the $300,000 loan. On February 1, 1983, Welch and Glass each executed promissory notes payable to FBT in the amount of $62,000. Ramsey approved the loans as the FBT loan officer and wired the loan proceeds to the Dayton Bank & Trust where the money was applied to reduce the Century Motors indebtedness. The Glass note was secured by 5,000 shares of Farmbanc Company stock and 37.5 shares of Century Motors stock. The Welch note was unsecured. On or about the same date of the Welch and Glass loans, Gary Ramsey borrowed $62,000 from the Dayton Bank & Trust on his own behalf and contributed the money to the reduction of the Century Motors debt.

Financial statements for Welch and Glass were not submitted to FBT until after the loans were made. The financial statement filed for Billy Mac Welch, dated June 30, 1982, shows total assets of $2,919,325, total liabilities of $661,701 and a net worth of $1,257,624. A financial statement for Franklin Glass dated February 1, 1983 shows total assets of $2,473,000, total liabilities of $1,119,633, and a net worth of $1,353,367. Ramsey never verified the accuracy of these financial statements. Furthermore, Ramsey did not receive prior Board approval for the loans and served as the acting loan officer, even though the loans were being made to benefit an entity in which Ramsey had a financial interest. Moreover, minutes of the February, 1983 FBT Board meeting do not indicate that the Welch and Glass loans were considered as loans in which a director had an interest, nor do they indicate that Ramsey abstained from voting on the loans. The FBT Board members testified that they were unaware of Ramsey's interest in Century Motors, were misled by his approval of the loans without revealing his interest, and would have probably disapproved the loans had they been aware that Ramsey had concealed his interests. After the default of the Glass and Welch loans, the FDIC, as FBT's assignee, filed a claim under the employee dishonesty clause of the St. Paul Blanket Bond.

The FDIC also presented a Blanket bond claim arising from the default of loans made to Donald A. Wilson. Donald A. Wilson was a real estate developer who had purchased 75 acres of land near Smyrna, Tennessee to develop into condominiums. Wilson financed the purchase by executing a January 23, 1982 promissory note to the property's sellers, Robert and Frances Harris, for the full purchase price of the property. Robert and Frances Harris thereby secured the first mortgage lien on the Smyrna property in the event that Wilson defaulted upon the note.

Wilson began a borrowing relationship with Farmers Bank & Trust on February 25, 1981. By November 25, 1981, Wilson owed FBT $77,000. Between November, 1981 and January, 1983, Wilson received several more fund advances from FBT until all of his outstanding advances were consolidated into one note of $300,000 on January 24, 1983. All of the funds evidenced by the $300,000 promissory note were used for the Smyrna project, except for $24,000 which was applied to a debt incurred in the purchase of an airplane. The $300,000 note was collateralized by a second mortgage lien on the Smyrna property. The FBT lien was secondary to the lien held by Robert and Frances Harris.

Gary Ramsey was Wilson's loan officer at FBT. Ramsey's December 31, 1981 financial statement indicates that Ramsey also held a 10% ownership interest in Wilson's Smyrna condominium project. Ramsey did not reveal this interest to the FBT Board of Directors. Furthermore, neither the Credit File Memorandum nor the Security Agreement which Ramsey prepared for Wilson's $300,000 note indicated that FBT's mortgage on the Smyrna property was inferior to any other mortgage. Since Ramsey did not reveal his interest in the Smyrna project to the FBT Board of Directors, neither the $300,000 note nor its composite advances were presented to the Board to be specially reviewed as insider transactions. When questioned by FDIC examiners during the April, 1983 review of FBT accounts, Ramsey stated that he had no

interest in the Smyrna project. Ramsey now admits that this was a lie.

In the Spring of 1983, Wilson defaulted upon his obligation to Robert and Frances Harris and the Smyrna property was foreclosed upon as a result. The foreclosure to Robert and Frances Harris extinguished the junior mortgage lien which FBT held on the property. Wilson subsequently defaulted on his $300,000 note to FBT and filed for bankruptcy. Wilson's bankruptcy case was dismissed and Wilson is left without any assets to satisfy the FBT obligation. The FDIC, as FBT's assignee on the note and Blanket Bond, submitted a claim to St. Paul for $282,015.15 for the amount, exclusive of interest, which FBT lost on the Wilson loans.

## CONCLUSIONS OF LAW

### I. THE CLAUSE (E) FORGERY CLAIM

On April 5, 1984, the FDIC presented St. Paul with a claim under clause (E) of the Blanket Bond, claiming that FBT suffered a loss due to the alleged forgery of Sonya Butcher's signature on the Bull Run Oil guarantee. Clause (E) of the Blanket Bond provides that St. Paul is obligated to indemnify its insured customers for any "loss resulting directly from the Insured having ... extended credit ... on the faith of ... any original ... personal guarantee ... which bears a signature of any ... guarantor ... which is a forgery." St. Paul refused to pay on the claim, and the FDIC maintains that St. Paul thereby breached the Blanket Bond contract.

The FDIC has the burden of proving its entitlement to recovery under the Bond by a preponderance of the evidence. The threshold element which the FDIC must prove to recover under Clause (E) is that the Bull Run Oil guarantee bears a forged signature. For a signature to constitute a forgery, the signature must be proved to have been neither executed nor authorized by the purported signatory. See *C.I.T. Corporation v. Janis*, 418 F.2d 960 (6th Cir.1969).

The FDIC's claim of forgery relies exclusively upon the testimony of Sonya Butch-

er. When asked at deposition to examine the signature upon the Bull Run guarantee, Sonya Butcher testified that "It's not my signature." Later in her March 8, 1988 deposition, Sonya Butcher was asked the following questions and gave the following answers:

Q. Okay. And its your testimony that that is not your signature on the Guaranty?

A. Yes.

Q. Okay. And that you did not authorize anyone to sign for you on that Guaranty?

A. No.

The Court finds that Mrs. Butcher's claim of forgery is rebutted by several significant factors. First, her testimony must be viewed in the light in which it was given. Mrs. Butcher first asserted the signature to be a forgery as a defense to an involuntary bankruptcy petition which had been filed against her in 1983. The FDIC and FBT were the primary creditors seeking Sonya Butcher's bankruptcy, and the $805,216.00 in principal and $431,176.64 in interest due on the Bull Run Oil note constituted a significant portion of the debt asserted against her. Facing the prospect of being involuntarily declared bankrupt, Sonya Butcher had an obvious interest in avoiding liability upon the Bull Run note by denying the validity of her signature. Facing a possible charge of perjury if she changed her story, Sonya Butcher had a continued interest in claiming the signature to be forged when she testified in this action. The persuasiveness of her testimony is thus limited by the possibility that it was motivated by this self interest.

Furthermore, Mrs. Butcher's testimony indicates that she did not have a clear recollection of whom she had authorized to sign her name upon letters and documents and what signatures she had ratified:

Q. To your knowledge, did you ever find out your name had been signed to something after the fact and okayed it?

A. I don't remember at this point. I mean, after the fact, if you say—could you be more specific?

Q. Well, say, by example, a document that someone signed your name to, and you were told later that I had someone sign your name to this document if you were unavailable.

A. The only thing that I could say, you know, people wrote letters for me and such things like that, but I am not aware—if we're getting around to—if you're talking about bank notes.

Q. No, I'm just talking about really any type of document; notes or corporate documents?

A. I'm not aware of any right now, and I don't recall.

Q. Okay.

A. That's the answer I have to give, because I don't remember.

\*　　\*　　\*　　\*　　\*　　\*

Q. Okay. Was Helen Kimbro (ph) ever authorized to sign your name to documents?

Q. Helen wrote letters and such for me.

Q. Did you—she sign your name?

A. She—occasionally to those, because she did a lot of my correspondence, as far as social letters and things like that.

Q. Sure.

A. But I don't know that Helen ever signed my name to anything that was—you know, people signed my name to checks and they were authorized, you know, wrote—paid monthly bills.

Q. Who were those people?

A. Ruth Williams, at my home, and Helen at one time.

Q. What about Judy Franklin?

A. Judy, I'm sure, signed my name to some checks, yeah, for check writing purposes. And I was aware of that, but I don't know that anyone ever signed my name to anything like a bank note.

Mrs. Butcher gave the following responses when shown the Bull Run promissory note executed on the same date as the guarantee in question:

Q. Do you recall ever having signed that promissory note for Bull Run Oil before?

A. You know, to be perfectly honest, I could have seen a lot of things. I wouldn't remember after this amount of time. I—you know, I wouldn't swear I haven't seen it, yet I don't remember it.

And I don't think I ever did. If you're asking me what I think, I don't think, ever, I saw it.

\*　　\*　　\*　　\*　　\*　　\*

Q. Is it possible, Mrs. Butcher, that you authorized someone to sign your name to this note?

A. I do not think so.

Q. Okay. Do you not think so or do you recall any conversation?

A. I recall no conversation about it.

The vagueness of Mrs. Butcher's testimony further undermines the reliability of her claim that her signature was forged upon the guarantee. Moreover, her identification of at least three other women who were authorized to sign her name to checks and other documents, and the vagueness of her recollection as to exactly what those women had been authorized to sign, raises the possibility that her name may have been signed to the guarantee with her general authorization.

The Court also finds the forgery claim to be undercut by the FDIC's failure to subpoena the testimony of Jake Butcher regarding the validity of his wife's signature upon the Bull Run guarantee. The parties have not disputed that Jake Butcher was an actual cosignor and the primary beneficiary of the guarantee. Accordingly, Jake Butcher would seem to be the individual best able to indicate whether the guarantee had indeed been signed or authorized by his wife, Sonya. The absence of Jake Butcher's testimony weakens the FDIC's claim of forgery.

Finally, the Court notes that Mrs. Butcher's denial of the authenticity of her signature upon the guarantee is uncorroborated by expert analysis or by the testimony of any other individual familiar with her signature. The signature on the guarantee does not differ significantly from her signature upon an unrelated promissory note which she admits to be authentic. The slight differences in the Bull Run signature may be the result of different pens, differ-

ent writing surfaces, or simple haste. Without the corroboration of expert analysis or a disinterested opinion regarding the authenticity of Sonya Butcher's signature upon the Bull Run Oil guarantee, the Court does not find it more likely than not that the signature is not authentic.

In consideration of the above factors, the Court finds that plaintiff has not met its initial burden under Clause (E) of the Blanket Bond of proving by a preponderance of the evidence that Sonya Butcher's signature was an unauthentic and unauthorized forgery. Since the FDIC has not proved that Sonya Butcher's signature was a forgery, it is unnecessary for the Court to consider whether FBT's loss on the Bull Run note directly resulted from the forgery. The Court finds that the FDIC is not entitled to indemnification for the loss sustained on the Bull Run Oil note.

## II. THE CLAUSE (A) DISHONESTY CLAIMS

Under Clause (A) of the Blanket Bond, the FDIC submitted indemnification claims for the following transactions: payments to Consolidated Financial Services; payments for "executive committee fees"; loans made for the purchase of Rhea Bancshares stock; loans made for the benefit of the Century Motors company; and loans made to Donald A. Wilson. Clause (A) of the Blanket Bond obligates St. Paul to indemnify the FDIC for:

> Loss resulting directly from dishonest or fraudulent acts of an Employee committed alone or in collusion with others.

> Dishonest or fraudulent acts as used in this Insuring Clause shall mean only dishonest or fraudulent acts committed by such employee with the manifest intent
> (a) to cause the Insured to sustain such loss, and
> (b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

### A. The Rhea Bancshares, Century Motors, and Donald Wilson Loans.

■ The FDIC's largest claims for indemnification were filed under Clause A of the Blanket Bond for three sets of loans made by Gary Ramsey: (1) loans made for the purchase of Rhea Bancshares stock; (2) loans made for the benefit of the Century Motors Company; and (3) loans made to finance Donald Wilson's condominium project.

As used within a fidelity bond, the phrase "dishonest or fraudulent acts" has received many varying interpretations. "In order to constitute fraud or dishonesty, it is necessary that the employee have the intent to deceive or cheat the employer." 13 *Couch on Insurance* 2d, Section 46:55. "The word 'dishonesty' is to be given a broad significance and includes any acts done in breach of the officer's duty to the bank and any wilful omissions to discharge the duties of his office." *Fidelity and Deposit Co. of Maryland v. Bates,* 76 F.2d 160, 171 (8th Cir.1935). "[D]eliberate deception by pretense and stealth constitute[s] dishonest and fraudulent conduct." *Federal Deposit Insurance Co. v. Aetna Casualty & Surety Co.,* 426 F.2d 729, 737 (5th Cir.1970). "Both misrepresentation of facts and deliberate deception by pretense and stealth constitute dishonest and fraudulent conduct within the terms of a fidelity bond to a bank." *First National Bank Co. v. Insurance Co. of North America,* 606 F.2d 760, 769 (7th Cir.1979). The Court's examination of the many opinions construing these dishonesty clauses reveals the paradigmatic case of dishonesty to exist where an employee has cheated and deceived his employer by furthering his own interests at the employer's expense and covering up his misdeeds. *See also Boston Securities, Inc. v. United Bonding Insurance Co.,* 441 F.2d 1302 (8th Cir. 1971); *Citizens State Bank v. Transamerica Insurance Co.,* 452 F.2d 199 (7th Cir.1971); *Maryland Casualty Co. v. American Trust Co.,* 71 F.2d 137 (5th Cir. 1934); *London & Lancashire Indemnity Co. v. Peoples National Bank & Trust*

*Co.,* 59 F.2d 149 (7th Cir.1932); *Arlington Trust Co. v. Hawkeye–Security Insurance Co.,* 301 F.Supp. 854, 857–858 (E.D.Va. 1969).

The Court finds that Gary Ramsey acted dishonestly with an intent to obtain financial benefit from the Rhea Bancshares loans. Unbeknownst to the FBT Board of Directors, Gary Ramsey was serving as the President of Rhea Bancshares at the time he authorized the loan of FBT funds to Walter Spiva, Thomas Parsons, and Alfred Cowley for the purchase of Rhea Bancshares stock. Moreover, at the time that he approved the loans, Ramsey was in the process of acquiring $500,000 worth of Rhea Bancshares stock for his own benefit. In approving the loans, Ramsey benefited his own interest in Rhea Bancshares by facilitating the company's recapitalization. Ramsey's interest in Rhea Bancshares admittedly caused him to process the loans without checking the validity of Spiva, Cowley, or Parsons' financial statements. Ramsey violated FBT's written loan policy by processing loans to borrowers in which he had a financial interest. Ramsey failed to reveal his conflict of interest when he presented the Rhea loans to the FBT Board of Directors. As a result, the loans did not receive the special Board consideration required for loans in which an officer or director had an interest. Moreover, Ramsey failed to abide by Board practice and recuse himself from voting on the loans when they were presented for approval.

Furthermore, Ramsey misrepresented the stability of Rhea Bancshares and the value of its stock. Ramsey indicated that Rhea Bancshares' indebtedness to Citizens & Southern Bank in Atlanta had been prepaid until 1986. Rhea defaulted upon that obligation in 1984 and its assets were foreclosed upon. Ramsey also indicated to the FBT Board that the book value of the Rhea Bancshares stock was $50 per share at the time that he authorized the Spiva, Parsons and Cowley loans. The Rhea stock had an actual book value of $12.28 at that time and a book value of $26.43 after the loan proceeds were invested into the Rhea stock.

Ramsey thus cheated the bank by using his position as FBT president to serve his personal interest in strengthening Rhea Bancshares to the detriment of the bank's interest in avoiding unsound loans. Furthermore, Ramsey deceived the FBT Board by failing to reveal his interest in the loans and by misrepresenting the value and stability of the Rhea Bancshares stock. The loans were founded upon Ramsey's acceptance of unverified financial statements and his misstatement of the Rhea Bancshares book value and stability. The Court thus finds that the loss which FBT suffered upon the default of the Spiva, Parsons, and Cowley loans resulted directly from Gary Ramsey's dishonest and fraudulent acts.

Ramsey also acted dishonestly and with the intent to obtain a financial benefit from the loans made to Franklin Glass and Billy Mac Welch for the benefit of the Century Motors Company. Glass and Welch obtained the loans to contribute to the retirement of the debt which Century Motors owed to the Dayton Bank & Trust. Ramsey owned 17.5% of the Century Motors stock and thus benefitted from the retirement of Century Motors' debt. Ramsey failed to check the validity of Glass and Welch's financial statements before making the loans. Ramsey thus cheated the bank by allowing his personal interest to compromise the performance of his duties and deceived the Board by failing to reveal his ownership of Century Motors stock. As a result of Ramsey's deception, the loans were not specially considered as insider transactions and Ramsey was not precluded from voting for their approval. The FBT Board members testified that they would have rejected the loans had they known of Ramsey's concealed interest in Century Motors. Accordingly, the Court finds that the loss which FBT suffered upon the default of the Glass and Welch loans was the direct result of Gary Ramsey's dishonesty.

The Court also finds that Ramsey acted dishonestly with an intent to receive a financial benefit from the loans made to Donald Wilson for Wilson's condominium project in Smyrna, Tennessee. Ramsey held a 10% interest in the Smyrna project,

# 1158

yet acted as Wilson's loan officer in violation of bank policy. Ramsey deceived the Board by failing to reveal his interest in the project. As a result of Ramsey's deception, the loans were not specially considered as insider transactions and Ramsey was not precluded from voting for their approval. Ramsey also deceived the Board by failing to reveal that the mortgage which FBT held on the Smyrna property was secondary to another party's lien on the land. Ramsey cheated the bank by allowing his personal interest in the success of the Smyrna project to compromise the bank's interest in avoiding poorly secured loans. The loss which FBT incurred on the loan was a direct result of Ramsey's acceptance of a second mortgage as security and his deception of the Board of Directors. Accordingly, the Court finds that FBT's loss on the Donald Wilson loans resulted from Gary Ramsey's fraudulent and dishonest acts.

St. Paul's primary defense to these claims is that the loss which FBT incurred on the loans is not covered by the Blanket Bond because Ramsey did not have the "manifest intent to cause the Insured to sustain such loss" required for coverage under Clause (A) of the Bond. In *Municipal Securities, Inc. v. Insurance Company of North America*, 829 F.2d 7 (6th Cir.1987), the Sixth Circuit examined whether the identical bond provision excluded coverage for a securities trader who caused her employer to sustain a loss by dishonestly exceeding the limit which had been put on her inventory and trading authority:

During the winter of 1984, Ms. Hargraves began making trades that took her far beyond the $2,000,000 inventory limit. She concealed this fact from her employer by failing to report certain purchases and by reporting sales that had not yet taken place. *Her evident motive was to cover up—and eventually recoup—trading losses that might threaten her job security and affect her commissions.* (She was entitled only to reduced commissions on trades that produced losses for the company, and her misconduct enabled her to pocket $14,674

in commissions to which she was not entitled because her trades had in fact resulted in losses.) By the time her misdeeds were discovered in March of 1984, Ms. Hargraves had run up a long position of $56 million; this was closed out at a loss of $956,931.39.

.　　.　　.　　.　　.

[The insurer] argues first that Ms. Hargraves had no "manifest intent" to "cause the Insured to sustain" the loss of $956,931.39. We agree. *Ms. Hargraves' manifest intent was to make money, not to cause her employer to lose money. She intended to violate her standing orders, to be sure, but not for the purpose of causing a huge loss. Ms. Hargraves deposition testimony established without contradiction that her purpose was to eradicate the losses, not increase them.*

Ms. Hargraves did intend her employer to lose $14,674 in commissions to which she was not entitled.

829 F.2d at 8, 9 (emphasis added).

As applied in *Municipal Securities*, the phrase "manifest intent to cause the Insured to sustain such loss" excludes bond coverage for an employee who does not intend to cause her employer to suffer a permanent deprivation of funds, but instead intends for her employer to recoup its losses. *Id.* The Court of Appeals did not examine whether the loss was the natural result of the employee's dishonest act, but instead examined the employee's subjective intent as reflected by her testimony and as inferred from whether she would gain or lose by the bank's loss. *Id.*

In the present case the Court finds that Ramsey intended for FBT to recoup its lost funds by the repayment of the loans which he dishonestly engineered. Ramsey's intent is clearly inferable from his interest in the companies receiving the loan proceeds. FBT was only at risk of incurring a loss upon the loans if the recipient companies became insolvent so that the companies' stock and assets were worthless when FBT attempted to collect upon the debts. The failure and insolvency of these companies,

however, would have rendered Ramsey's interest in them to be without value. Thus, Ramsey could have only intended to cause the bank to sustain a loss on the loans if he also intended to wipe out a vast portion of his assets in the process, including his ownership interest in FBT. The evidence does not indicate that Ramsey had such a financially suicidal intent. Instead, the evidence indicates that Ramsey was motivated to dishonestly make the loans out of his financial interest in the success of Rhea Bancshares, Century Motors, and Donald Wilson's condominium project. Ramsey's "manifest intent was to make money, not to cause [his] employer to lose money." *Municipal Securities*, 829 F.2d at 9. If the companies had succeeded as Ramsey intended, the loans would have been collectible and FBT would not have sustained any loss.

The FDIC contends that the question of Gary Ramsey's intent to cause the bank to sustain a loss on the loans is settled by his guilty plea to the criminal charge of willfully misapplying FBT funds with the intent to injure the bank. The Court disagrees. The criminal charge brought against Ramsey was based upon his engineering of the CFS and executive committee payments, not on his actions regarding the loans in question. Ramsey's plea is thus irrelevant to his intent in making the loans.

The Court finds that while the loss which FBT sustained on the Rhea Bancshares, Century Motors, and Donald Wilson loans may have been due to Ramsey's dishonesty and negligence, they were not due to his "manifest intent to cause the Insured to sustain such loss." Accordingly, the FDIC is not entitled to indemnification under Clause (A) of the Blanket Bond for the loss incurred on those loans.

B. The Consolidated Financial Service Payments.

■ The FDIC also seeks $70,666.70 under Clause (A) of the Blanket Bond for payments made from FBT to Consolidated Financial Services. The FDIC maintains that Gary Ramsey acted dishonestly in approving payments to CFS when he knew that the company had not rendered any services to FBT. The Court finds, however, that CFS rendered marketing and consulting services to FBT in return for ten monthly payments of $1,666.67. Though the FBT Board of Directors was unaware of the CFS contract, Ramsey had the inherent authority as FBT President to enter into contracts without prior Board approval. Moreover, the payments were included in the Board's monthly financial statements under the heading "fees". Ramsey's close ties to CFS Chairman Jake Cantrell and Ramsey's later acquisition of an interest in CFS do not make the arrangement dishonest absent some proof that FBT paid more than fair value for services rendered. The FDIC has presented no proof to indicate that the services rendered were not worth the $1,666.67 payments. Thus, the Court can not find that the bank was dishonestly cheated or deceived in the exchange of payments for services. Moreover, absent proof that the services were not worth the payments, the court can not find that FBT suffered any loss in the exchange. Accordingly, the FDIC can not recover for the ten payments of $1,666.67 to Consolidated Financial Services.

However, apart from the monthly checks for $1,666.67, Ramsey also ordered and authorized three other checks of $18,000 each, transferring a total of $54,000 from FBT to CFS. CFS President Russell McGee supervised all of CFS's consulting jobs, yet knew of no services that CFS had performed in return for the $54,000. Ramsey later admitted in his deposition testimony that he knew that CFS had not performed any additional services to justify the payments, that the payments were motivated solely by his personal indebtedness to Jake Cantrell, and that he had attempted to conceal the payments from the FBT Board of Directors. Ramsey clearly intended to cheat and deceive the bank with regard to the $54,000 payments. Thus, Ramsey acted dishonestly in knowingly causing the bank to make unjustified payments to CFS, and FBT obviously suffered a resulting loss in transferring funds for which it received no consideration. The Court thus finds that the FBT suffered a loss resulting from

Gary Ramsey's dishonest acts with respect to the payment of the $54,000 to CFS.

The Court also finds that Ramsey had the requisite intent to cause the bank to sustain the loss of the $54,000, since he unquestionably intended to permanently deprive the bank of that sum. *See Municipal Securities*, 829 F.2d at 9; *Fitchburg Savings Bank v. Massachusetts Bonding and Insurance Co.*, 274 Mass. 135, 174 N.E. 324, 328 (1931).

The Blanket Bond only covers losses resulting from an employee's acts committed with the manifest intent to obtain financial benefit for himself or another person or organization. The court finds that Gary Ramsey had this intent. There can be little dispute on this issue since Ramsey has admitted that he intended for CFS Chairman Jake Cantrell to receive the financial benefit of the $54,000 payments. Moreover, Ramsey himself obtained a financial benefit from his dishonesty since part of the CFS payments were used to purchase a life insurance policy for his benefit.

St. Paul maintains that FDIC's recovery of the $54,000 is barred by the provision within clause (A) excluding coverage for "salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions, or other employee benefits earned in the normal course of employment." An examination of the cases applying this provision reveals that recovery is barred when the following two conditions exist:

1) The employer knowingly pays funds directly to the employee; and

2) The employee defrauds the employer into believing that the employee has earned the funds as compensation for his work.

Thus, in *Municipal Securities, Inc. v. Insurance Company of North America*, 829 F.2d 7 (6th Cir.1987), the Court of Appeals found that the identical bond provision excluded recovery for the inflated commissions paid to a securities trader who had dishonestly covered up her trading losses. *Id.* at 8. The Sixth Circuit based its conclusion in *Municipal Securities* on the decision rendered by the United States District Court for the District of Utah in *Verex*

*Assurance, Inc. v. Gate City Mortgage, Inc.*, C–83–0506W 1984 WL2918 (D.Utah, December 4, 1984). In *Verex* the District Court found that the identical bond provision excluded recovery for the commissions received by bank officers upon dishonestly issued loans. In *Benchmark Crafters v. Northwestern Nat. Insurance Co.*, 363 N.W.2d 89 (Minn.App.1985), the Minnesota Court of Appeals found that the provision in question excluded recovery for the salary which an employee continued to receive after he began performing his job dishonestly. *See also Hartford Accident and Indemnity Insur. Co. v. Washington Nat. Insurance Co.*, 638 F.Supp. 78 (N.D.Ill. 1986); *Mortell v. Insurance Co. of North America*, 120 Ill.App.3d 1016, 76 Ill.Dec. 268, 458 N.E.2d 922 (1984). In all of these cases, the employers knowingly paid the disputed funds directly to the employees on the belief that the employees were entitled to the payments as compensation for honest work.

In construing the provision in question, the District Court in *Verex* found that "the coverage provided by the rider is quite narrow: The paradigmatic scheme that would be covered by the rider is an embezzlement. Little else would seem to be covered." *Verex Assurance, Inc. v. Gate City Mortgage, Inc.*, C–83–0506W, slip op. at A4 (D.Utah, December 4, 1984). The Court agrees with the conclusion in *Verex* that the "salaries, commissions, fees" provision significantly narrows the coverage of the bond, but does not wholly negate it. The bond continues to cover embezzlement. Where the employer does not knowingly pay funds to its employee under the belief that the funds have been honestly earned, but is instead unaware of the employee's receipt of the funds or pays the lost funds for some purpose other than the employee's compensation, the employee has committed pure embezzlement which is recoverable under the bond.

In the present case, the FBT Board of Directors did not knowingly pay the $54,-000 directly to Ramsey. Neither the CFS payments themselves nor Ramsey's benefit from the payments were revealed to the

Board. Being unaware that payments were being made to Ramsey or CFS, the Board could not have believed that the payments had been earned by them as compensation. The court thus finds that the payments did not constitute "salary, commissions, fees, ... or other employee benefits earned in the normal course of employment." The $54,000 paid to CFS constituted pure embezzlement which the FDIC is entitled to recover under Clause (A) of the Blanket Bond.

## C. Executive Committee Fees

■ The FDIC has also sought indemnification under Clause (A) for the $170,000 paid to Gary Ramsey under the guise of "executive committee fees." The parties do not dispute that the executive committee fees were paid with the intent to permanently deprive FBT of the $170,000 and with the intent to obtain financial benefit for Gary Ramsey and Jake Cantrell.

The parties dispute whether it was dishonest for Ramsey to receive the fees. Ramsey has admitted that he constituted the entire "executive committee", that the fees were paid directly to him, that he performed no additional service for the fees beyond his regular duties as bank president, and that he did not reveal the payments to FBT's Board of Directors but instead attempted to conceal the payments by including them within the "fees" category of the financial statement without explanation. Ramsey's acts were thus dishonest within the meaning of the bond: he cheated the bank by taking funds which he had not earned; he deceived the Board of Directors by not revealing that he was the money's recipient and that he had performed no services for the fees.

St. Paul maintains, however, that the executive committee payments are excluded from the bond's coverage as "salaries, commissions, fees ... or other employee benefits earned in the normal course of employment." The Court finds that the FBT Board of Directors was responsible for setting the amount and form of bank officers' compensation. The board minutes indicate that Ramsey's compensation was set in the form of a $50,000 per year salary. The FBT Board was unaware that Ramsey was the recipient of the $170,000 paid as "executive committee fees." Being unaware of Ramsey's receipt of the payments, the Board could not have knowingly authorized the payments to increase Ramsey's compensation. Accordingly, the Court finds that Ramsey's receipt of the "executive committee fees" constituted pure embezzlement, not within the exclusion of "employee benefits earned in the normal course of employment." The FDIC was thus entitled to indemnification for the $170,000 which Ramsey received as "executive committee fees".

## III. THE SECTION 12 DISCOVERY PROVISION

■ St. Paul claims that the FDIC's recovery for the CFS and "executive committee fees" is barred by Section 12 of the Blanket Bond, which provides in relevant part:

This bond shall be deemed terminated or cancelled as to any Employee—(a) as soon as any Insured, or any director or officer not in collusion with such person, shall learn of any dishonest or fraudulent act committed by such person at any time against the Insured or any other person or entity ...

Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination.

Specifically, St. Paul claims that FBT vice-president and controller Robert Marion Anderton and administrative vice-president Eunetta Carmack's knowledge of the CFS and "executive committee" payments made in January, 1982 terminated the bond's coverage for any funds subsequently embezzled by Gary Ramsey.

Eunetta Carmack received and processed the CFS invoices and drew up the checks for their payment. Those checks were presented with the "executive committee" checks for Anderton's or Ramsey's authorization and signature. Carmack and Anderton thus both knew of the payments by

participating in their processing. However, neither Carmack nor Anderton investigated the validity of the invoices or the fees. Carmack did not investigate the invoices or payments because it was not her responsibility as administrative vice-president. Anderton did not investigate the payments because he had been intimidated by Ramsey into following Ramsey's directions without question.

The Court does not find that Carmack or Anderton's knowledge of the CFS and executive committee payments constituted knowledge of Ramsey's dishonest acts. Carmack and Anderton testified that Gary Ramsey's handling of the CFS and executive committee payments did not appear to them to be dishonest. Anderton, however, thought the executive committee payments to be "unusual". An officer's sense that payments are unusual, or even his suspicion that the payments are dishonest, does not constitute discovery of dishonesty under a fidelity bond. "Suspicion alone does not satisfy the test of discovery. A realization that a highly respected and able bank official has betrayed his trust should and would come hard to those who trusted him." *United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360 (8th Cir.1971). "[I]rregularities and discrepancies in accounts, if as consistent with the integrity of employees as their dishonesty, does not constitute a discovery, even though dishonest acts may later be found to exist." *Wachovia Bank & Trust Co. v. Manufacturers Cas. Ins. Co.*, 171 F.Supp. 369, 376 (M.D.N.C.1959). Discovery of dishonesty exists only when the officers have "knowledge which would justify a careful and prudent man in charging another with fraud or dishonesty." *American Employers' Ins. Co. v. Raton Wholesale Liquor Co.*, 123 F.2d 283 (10th Cir.1941). The CFS and executive committee payments did not in themselves indicate that Ramsey was acting dishonestly. Without an investigation into the validity of the payments, Carmack and Anderton did not have the requisite knowledge to justify any charge against Ramsey. Moreover, even proof of Anderton or Carmack's negligence would not bar recovery. "[N]either negligence nor inattention, nor any failure to discover what by diligence might have been discovered, nothing, in fact, short of actual discovery by the bank of dishonesty or a positive breach of an imperative condition, will defeat claims for loss caused by that dishonesty, unless it is otherwise provided in the contract." *United States Fidelity & Guar. Co. v. Commercial Nat. Bank*, 62 F.2d 718, 719–720 (5th Cir.1933). St. Paul has not claimed that the contract provides otherwise. Accordingly, the Court finds that the FDIC is not barred from recovery by Section 12 of the Blanket Bond.

## CONCLUSION

In light of the proof presented at trial, the Court finds that the plaintiff, Federal Deposit Insurance Corporation, is entitled to indemnification from the defendant, St. Paul Fire and Marine Insurance Company, for $170,000 which Gary Ramsey received as "executive committee fees" and for $54,000 paid to Consolidated Financial Services. The FDIC has not proven its entitlement to indemnification for the amount lost on the Bull Run Oil note, the $1,666.67 monthly payments made to CFS, or the loans made to Alfred Cowley, Thomas Parsons, Walter Spiva, Billy Mac Welch, Franklin Glass, and Donald Wilson.

An Order of judgment will be entered contemporaneously with this Memorandum.

## ORDER

For the reasons stated in the contemporaneously entered Memorandum, the Court hereby enters judgment in the above-styled action in favor of the plaintiff, Federal Deposit Insurance Corporation, in the amount of $224,000.