**Steven C. BLOCK, Trustee in Bankruptcy for Midwestern Companies, Inc., Appellant,**

**Titan Engineering, Inc.; Titan Energy, Inc.,**

v.

**GRANITE STATE INSURANCE COMPANY, Appellee.**

**No. 91–2027.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 9, 1992.

Decided May 11, 1992.

Michael P. Healy, Kansas City, Mo., argued, for appellant.

Stanley N. Wilkins, Kansas City, Mo., argued, for appellee.

Before MAGILL, LOKEN, and HANSEN, Circuit Judges.

LOKEN, Circuit Judge.

The dispositive issue in this diversity case is whether a bankrupt insured discovered a substantial misappropriation by its former president before coverage under its employee fidelity insurance policy expired. Applying Missouri law, the district court[1] granted summary judgment to defendant Granite State Insurance Company on the coverage issue. Steven C. Block, bankruptcy trustee for Midwestern Companies, Inc., appeals. Having carefully reviewed the record under our familiar standards for reviewing the grant of summary judgment,

---

**1.** The Honorable Howard F. Sachs, Chief Judge, United States District Court for the Western District of Missouri.

see, e.g., *Government Employees Ins. Co. v. Simon,* 917 F.2d 1144, 1146 (8th Cir. 1990), and having considered questions of state law *de novo,* we affirm.

## I.

On August 15, 1983, Granite State issued a one-year Property Owners Policy to Midwestern. Section III of that policy provided Comprehensive Crime Coverage. On April 18, 1984, the policy was cancelled for non-payment of premiums. Therefore, the policy covered a loss from employee dishonesty if Midwestern "discovered" the loss by April 18, 1985, and reported the loss to Granite State "as soon as practicable" after discovery. Although the entire dispute is more complex, the parties agree that Granite State is entitled to summary judgment on the coverage question if Midwestern did not timely discover that its then-president, Ronald R. Walker, improperly diverted $325,000 from Titan Energy Engineering, Inc., a Midwestern subsidiary, to his personal account.

In the fall of 1983, Titan loaned a $750,000 down payment to the buyer of an ethanol plant in order to book the sale in Midwestern's third quarter. In early October, a repayment of $325,000 earmarked for Titan was nonetheless wire transferred to Walker's personal bank account. The bank notified Titan of the apparent mistake, a company accountant ordered the money transferred to Titan's account, but Walker had the money transferred back to his personal account, claiming that the buyer was repaying a personal loan.

On March 29, 1984, Midwestern's audit firm resigned because of its "unsuccessful efforts to obtain information and documentation" concerning Midwestern and its subsidiaries. The resignation letter listed among the "allegations" it had been unable to probe:

That the downpayment of $750,000 which supported profit recognition in the third quarter of 1983 ... was returned to the buyer shortly after the end of the quarter ... and, further, *that a subsequent payment from the buyer of $325,000*

*was deposited to the account of Mr. Walker.*

(Emphasis added.) When the Midwestern directors met with the resigning auditors two days later, Walker claimed that "appropriate access to the complete records of Titan Energy would clear up" the $325,000 repayment question.

Midwestern's board then hired an attorney and an accountant to investigate the allegations reported by the resigning auditors. On May 17, 1984, they submitted a confidential Management Report specifically addressing the $325,000 repayment issue:

An ancillary problem to the sale of [the ethanol plant] is the receipt by Mr. Walker of the aforementioned $325,000 payment.... According to Mr. Walker, the $325,000 transaction is not comprehensible without understanding a few problems that surrounded the sale.

\* \* \* \* \* \*

Therefore, according to Mr. Walker ... the payment of the $325,000 to Mr. Walker ... was a [personal] loan repayment on behalf of [the buyer].

\* \* \* \* \* \*

Mr. Walker also remarked that even in the event the payments ... were intended to be repayments of a Titan loan ... payment of these amounts to him instead would be entirely proper, for the reason that the Company was at that time indebted to him personally in an amount in excess of $325,000....

The undersigned have not reviewed sufficient documentation to confirm or deny Mr. Walker's recollection of the events....

The Management Report's conclusions included a recommendation that all 1983 ethanol plant sales "be re-examined to determine if adequate downpayments were timely received," an issue affecting Midwestern's financial disclosure and reporting obligations to the Securities and Exchange Commission. However, there was no conclusion or recommendation regarding the $325,000 payment to Walker.

The SEC did commence an investigation into the affairs of Midwestern, and the company filed a Chapter 11 bankruptcy petition on May 24, 1984. Joseph W. Bishop became Midwestern's president in June 1984. A trustee was appointed and the case was converted to a Chapter 7 proceeding in 1986. In July 1987, Block as trustee submitted Midwestern's claim to Granite State for the $325,000 under Section III of the policy. In preparing the claim, Midwestern overlooked the effect of the policy's premature cancellation on the discovery deadline. Thus, the proof-of-loss affidavit submitted by Bishop averred that Midwestern discovered the loss in July 1985. Granite State denied the claim as beyond the coverage period, and Block filed this lawsuit in an attempt to overcome Bishop's coverage-defeating averment.

The district court did not hold Midwestern estopped to claim an earlier discovery date but did consider the Bishop affidavit "a significant admission, not overcome by anything presented by the trustee." Applying *Jefferson Bank & Trust Co. v. Central Sur. & Ins. Corp.*, 408 S.W.2d 825 (Mo.1966), for the legal standard of discovery, the district court granted summary judgment to Granite State because Midwestern had failed to present specific evidence of an earlier, timely discovery of Walker's alleged misfeasance. On appeal, Block argues that summary judgment was improperly granted on this issue.

## II.

Under the *Jefferson Bank* standard, discovery occurred when Midwestern "must reasonably have known and recognized" that Walker misappropriated the money, that is, when "there [were] facts known ... which would lead a reasonable person to an assumption that a shortage existed." In applying this standard:

> Knowledge available to the insured must rise above a mere suspicion of loss. The fact that an investigation after the termination of the policy leads to the disclo-

sure of an actual defalcation does not raise a previous suspicion to the level of a discovery. Inefficient business procedures, or irregularities and discrepancies in accounts, if as consistent with the integrity of employees as their dishonesty, does not constitute a discovery, even though dishonest acts may later be found to exist.

*Jefferson Bank,* 408 S.W.2d at 831–32.

In this case, Midwestern had immediate knowledge of the October 1983 transaction because Walker instructed the company's accountant to transfer the $325,000 earmarked for Titan to Walker's personal account. The transaction became suspicious no later than March 1984 when the resigning auditors included it in their list of "allegations" that Midwestern's management had failed to explain. Midwestern then hired an outside accountant and attorney to investigate this and other allegations. Their May 1984 report described the $325,000 transaction as an "ancillary problem"[2] and stated that Walker's explanations were unconfirmed. Throughout this period, Walker repeatedly claimed that he was entitled to the money, either as a personal loan repayment or because the company owed him even more.

On this record, one can say with confidence that the loss was not discovered as of the May 1984 Management Report. Block emphasizes the inherently suspicious manner in which Walker received the $325,000 and recounts how many people at Midwestern knew of the suspicious transaction. But mere suspicion is not enough under *Jefferson Bank.* There must be some verification that improper conduct causing an insured loss in fact occurred. *See United States Fid. & Guar. Co. v. Empire State Bank,* 448 F.2d 360, 366 (8th Cir.1971) (interpreting *Jefferson Bank*). Here, Midwestern hired outside experts to investigate the resigning auditors' suspicion. The outside experts investigated; they had a duty to report any loss they discovered to Midwestern; and their Re-

---

**2.** It is obvious that everyone was more concerned with whether Titan made a bogus loan of $750,000 to accelerate the booking of a sale, concerns that later blossomed into an SEC investigation of Midwestern's financial disclosures.

**1130**

port did not accuse Walker of misappropriating the $325,000 or suggest that an insured loss might have occurred. There can be no better evidence that a "reasonable person" in the position of the insured would not have discovered the loss than the fact that these outside experts did not.

That leaves the question whether Midwestern discovered the loss between May 1984 and the April 1985 coverage deadline. Block presented no additional evidence of discovery in that period, only deposition testimony by numerous former Midwestern employees that they had unanswered suspicions at the time they left the company. As the district court emphasized, *not one* Midwestern official testified to a contemporaneous belief that Walker misappropriated the money.[3] In these circumstances, we agree with the district court that Block presented no evidence creating a genuine dispute as to the July 1985 discovery date established by Midwestern's proof-of-loss affidavit. Thus, the district court properly granted summary judgment on the coverage issue.

The decision of the district court is affirmed.

---

**3.** Indeed, at oral argument, Block's counsel did not know if Midwestern ever demanded that   Walker return the money.