A95A2278. BOOMERSHINE PONTIAC-GMC TRUCK, INC.
v. GLOBE INDEMNITY COMPANY.
(466 SE2d 915)

SMITH, Judge.

Boomershine Pontiac-GMC Truck, Inc. d/b/a Boomershine Nissan appeals from the trial court's grant of summary judgment to its insurer, Globe Indemnity Company d/b/a Royal Insurance Company, in this suit brought by Boomershine to recover proceeds under a pol-

icy of general commercial insurance.

Boomershine suffered losses from employee dishonesty. Upon discovery of these losses it submitted a claim to Royal. The policy issued by Royal to Boomershine covered such losses, but Royal denied the claim on the ground that the losses were not "discovered" within the time required under the policy.[1] The policy language in issue provides that Royal would "pay only for covered loss discovered no later than one year from the end of the policy period." No dispute exists that the policy period ended on June 1, 1991. The sole issue for decision in this appeal, therefore, is the propriety of the trial court's conclusion that the evidence established that the loss was not "discovered" prior to June 1, 1992.

The trial court found that "[b]ecause Yancey was never able to identify prior to June 1, 1992, if losses were incurred, where losses existed, how losses were incurred or the amounts of any losses incurred, . . . [Boomershine] did not discover the covered losses within the one year extension permitted by the policy." Because we find the trial court misstated the standard to be met, and because we conclude that genuine issues of material fact remain regarding when the loss was "discovered" within the meaning of the policy, we reverse the grant of summary judgment.

Finding the point at which the loss is "discovered" when the problem is employee dishonesty is always difficult; unlike some other insured losses, it is usual in such situations for the loss to be concealed insofar as possible, for as long as possible. It is therefore not surprising that Georgia cases have only rarely addressed issues surrounding the ascertainment of the date when a loss is "discovered" for purposes of complying with policy requirements in a fidelity claim. We find persuasive, however, the guiding principles set forth in *Wachovia Bank &c. Co. v. Manufacturers Cas. Ins. Co.*, 171 FSupp. 369 (M. D. N. C. 1959). In *Wachovia Bank &c. Co.*, the bank brought an action in federal court in North Carolina on a banker's indemnity bond to recover proceeds covering a loss resulting from the embezzlement of bank funds by a teller. The principal question there, as here, was whether the loss was "discovered" prior to expiration of coverage. Id. at 375.

In general, the court held that to constitute "discovery," facts must be known that would lead a reasonable person to assume that a loss exists. Id. at 375 (5). Those facts must be viewed as they would have been at the time discovery is asserted and not in the light of knowledge that was subsequently acquired. The insured need not

---

[1] Certain other issues, including timeliness and adequacy of notice and proof of loss were not considered by the trial court because Royal's declination of coverage was made upon this single ground.

have been in possession of details such as the exact amount of the loss or the specific manner in which the scheme caused a loss, as required by the trial court here, but the knowledge relied on to constitute "discovery" must rise above mere suspicion of loss. Simply being aware of facts that lead to other facts that ultimately reveal the existence of a shortage does not satisfy this test. The disclosure in an investigation after the expiration of the discovery period of an actual defalcation does not raise a previous suspicion to the level of a "discovery." Discovery of unusual or suspicious circumstances does not always constitute a "discovery" of employee dishonesty even though the suspicion is confirmed when dishonest acts are later found to have occurred; if inefficient business procedures or discrepancies in accounts are as consistent with employees' integrity as with their dishonesty, such circumstances do not constitute a "discovery" under the policy terms. Id. at 375-376 (5).

It is extremely difficult, then, to determine on summary judgment when a loss caused by employee dishonesty was "discovered." In fact, it has been acknowledged that " '[w]hether the information possessed by the [insured] amounts to actual knowledge of loss or wrongdoing or is merely a basis for suspicion is usually regarded as a question for the jury under proper instructions from the court, provided there is room under the evidence for any reasonable difference of opinion.' [Cit.]" *First Fed. Sav. &c. v. Commercial Union Ins. Co. &c.*, 115 Ga. App. 756, 758 (156 SE2d 101) (1967). *First Fed. Sav. &c.* involved an employee dishonesty claim on a fidelity bond that provided for termination of the bond "when 'the insured . . . or any officer thereof not in collusion with such employee discovers any fraudulent or dishonest act on the part of'" the dishonest employee. Id. at 757. We held that some evidence existed from which a jury could properly find "discovery." Id. at 759 (1).

Our task in this case is to determine whether, as a matter of law and without any reasonable difference of opinion, the information possessed by Boomershine on June 1, 1992 (the date coverage under the Royal policy expired), did or did not meet the standard of being actual knowledge of employee dishonesty, which would constitute a "discovery." If the facts do not show as a matter of law either that Boomershine had such knowledge or that it did not, this case falls under the general rule, and a jury must determine whether the loss was "discovered" by June 1, 1992. We find that the general rule indeed does control here, and we must reverse the trial court's grant of summary judgment to the insurer.

The record shows that Charles Yancey, secretary-treasurer of Boomershine, was in charge of operations at all the Boomershine organizations, including Boomershine Nissan. By April 1992, Yancey asked Norman Ficke, the general manager of the Nissan dealership in

Duluth, to look into his used car operation because it "just didn't seem right." Ficke reviewed it, and reported back to Yancey that he thought "everything was okay."

Yancey continued to believe that a problem existed, however. He noticed that the operation was generating unusually high accounts receivable that were aging, but as soon as they were brought to Ficke's attention, they would be paid "real promptly." In addition, when these receivables were paid, payment was sometimes made in a peculiar manner: One check would pay off several receivables, and the amount of the receivables did not always match the exact amount of the check. Yancey was also suspicious for other reasons: The account covering those cars Boomershine Nissan bought for wholesale resale showed a loss every month, which was unusual although the loss was small; the paperwork in the used car department was generally sloppy; and he never saw one of the two people in the wholesale used car department.

Ficke did not view the problem as seriously as Yancey did, however, and in fact, Ficke thought a reasonable explanation for the unusual circumstances could be found in the unusually high volume of wholesale business engaged in by Boomershine Nissan. In April 1992, Yancey discharged Ficke, partly because no solution had been found to the problem. Before being discharged, Ficke never informed Yancey that any loss had been sustained in the used car department. Yancey admitted that as of the date he discharged Ficke, in April, he still was unsure what the problem was.

Yancey hired David Pollard to succeed Ficke, and Pollard began his employment on June 1, 1992. Unlike Ficke, Pollard had an accounting background in addition to his automotive management experience. In the interim, Yancey himself tried to cover Ficke's duties. Yancey's initial instructions to Pollard were not to bother managing any other aspects of the dealership but to concentrate exclusively on finding the problem in the used car department.

Pollard complied with this directive, and he soon became aware himself of "something wrong." Pollard's investigation was still continuing when on July 6, 1992, Harold Dixon, an employee in the used car department and the father of the used car manager, confessed that he had been stealing money from the dealership by pocketing the proceeds of checks he authorized to be drawn on the dealership account for the purchase of fictitious vehicles for resale. He estimated he had stolen about $170,000 from Boomershine.

Both Pollard and Yancey testified on their depositions they did not know the exact cause of the problem until Dixon confessed. Yancey testified that the time he spent at the Nissan dealership between Ficke's departure and Pollard's arrival, which was prior to the expiration of coverage under the policy, led him to learn more about the

problem. He became certain then that a problem existed, although it did not lead him to any specific employee or employees. He thought it possible that an employee might be "skimming money off the top" but confessed that his suspicions centered more on the other employee than on Dixon. Although Pollard's knowledge soon became more detailed, that knowledge was necessarily acquired after June 1, 1992. Pollard knew some cars were being sold by Boomershine for less than what had been spent to acquire them, which was highly suspicious, particularly in light of entries reducing the book values of the cars.

Based on this record, we cannot agree with Boomershine's assertion that the record shows that by June 1, 1992, Yancey "concluded correctly that an employee in the used car department was causing losses through dishonest operations." Certainly, he thought this was a possibility. But the record shows clearly only that Boomershine was aware of small losses shown by the wholesale used car department, losses which were characterized as minor, and that Yancey referred outwardly to his thoughts regarding employee dishonesty as "suspicions." Pollard testified that Yancey did not point him in any specific direction in the used car operation. Pollard admitted that even after June 1, 1992, when he discovered that cars were sold for less than their cost, that could have been caused by something other than employee misappropriation of funds. The record does show a statement by Pollard that at some time before June 15, 1992, he knew a loss existed because he had assets listed that he could not find. He acknowledged, however, that even on June 15, 1992, causes other than employee dishonesty could have been responsible for such losses. The record does not establish as a matter of law that Boomershine "discovered" the loss within the coverage period.

Likewise, however, the record also fails to establish as a matter of law that Boomershine had *not* "discovered" the loss by June 1, 1992. The policy recites that it covers employee dishonesty whether the dishonest employee is identified or not. If Boomershine can show that it knew by June 1, 1992, that it was definitely the victim of employee dishonesty, then despite its failure by that date to identify Dixon as the culprit, the loss would be covered under the policy as written. Under this policy's language, coverage depends on the "discovery" date, which in turn depends on the nature and extent of information possessed by Yancey (and possibly *only* by Yancey) on June 1, 1992. Since the record does not establish with precision the extent of Yancey's knowledge on that date and reasonable minds could differ as to what was known on that date by Yancey, the question of coverage may not be decided as a matter of law. A jury must determine this issue.

*Judgment reversed. Birdsong, P. J., and Johnson, J., concur.*

DECIDED JANUARY 17, 1996.

*Stephen C. Whicker*, for appellant.
*Welch, Spell, Reemsnyder & Pless, Ronald D. Reemsnyder, Hope R. Arbery*, for appellee.