

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-4-2000

# Resolution Trust Corp. v. Fidelity & Deposit Co. of MD,et al. (Part II)

Precedential or Non-Precedential:

Docket 98-6368

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

## Recommended Citation

"Resolution Trust Corp. v. Fidelity & Deposit Co. of MD,et al. (Part II)" (2000). *2000 Decisions.* Paper 19.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/19

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Volume 2 of 2

Filed February 4, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6368

RESOLUTION TRUST CORPORATION,
as Receiver for City Savings, F.S.B., in Receivership,

v.

FIDELITY AND DEPOSIT COMPANY OF MARYLAND;
WILLEM RIDDER; JOHN T. HURST; LYNDON C. MERKLE;
GREGORY DEVANY

Federal Deposit Insurance Corporation, as statutory
successor to Resolution Trust Corporation,

          Appellant

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civ. No. 92-01003)
District Judge: Honorable William H. Walls

Argued December 15, 1999

BEFORE: MANSMANN, GREENBERG, and MCKEE,
Circuit Judges

(Filed: February 4, 2000)

b.      Whether there is evidence from which a reasonable jury could conclude that the employees acted with the manifest intent to obtain a financial benefit for themselves or a third person (subsection b's requirement)

Given the standard of manifest intent described above, we turn our analysis to the specific requirements of subsection (a) and subsection (b) of the fidelity provision. As previously mentioned, the plain language of the fidelity provision covers only those losses caused by employee misconduct undertaken with the manifest intent (1) to cause a loss, and (2) obtain a certain type of financial benefit for the employee or a third person. Wefirst will address in this section the scope of the latter requirement, found in subsection (b) of the fidelity provision, because it informs the remainder of our analysis of the coverage issues raised in this appeal.

At the outset, it is important to note that the plain language of that subsection indicates that an insured may meet its requirements in two ways. First, the insured may satisfy subsection (b) by demonstrating that the dishonest employee acted with the purpose of obtaining for himself or herself a financial benefit other than "salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment." Alternatively, the insured may meet the requirements of subsection (b) by showing that the dishonest employee acted for the purpose of obtaining for a third party a financial benefit not included within the list just enumerated. F&D contends that it is entitled to summary judgment because the individual defendants' actions do not satisfy either aspect of subsection (b). We will address its arguments separately below.

i. Whether the evidence could support a finding that the individual defendants acted with the manifest intent to obtain a financial benefit for themselves "other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment"

In the district court, the RTC contended that Hurst, Merkle and Ridder committed their fraudulent or dishonest

50

acts because they were motivated by a desire to obtain the golden handcuff payments, and that DeVany was motivated by his desire to receive a $1,000 payment at the close of the HonFed sale. See SA at 206-07. It also asserted that Hurst, Ridder and Merkle acted with the intent to obtain lucrative employment opportunities with HonFed. In response, F&D claims that there is no evidence indicating that Ridder, Hurst and Merkle acted with the manifest intent to obtain for themselves employment opportunities with HonFed or signing bonuses with that company. Focusing next on the plain language of the exclusionary clause in subsection (b), F&D argues that both the golden handcuff payments and the $1,000 payment constitute bonuses or awards. From that premise, F&D contends that because the plain language of subsection (b) excludes coverage for losses resulting from employee misconduct motivated by a desire to receive, inter alia, bonus payments and other forms of compensation from the insured, the employees' desire to obtain the handcuff payments does not provide a basis for indemnity.

To reiterate, subsection (b) of the fidelity provision requires that the employee engage in the dishonest or fraudulent conduct with the manifest intent "to obtain financial benefit for the Employee . . . , other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment." App. at 562. As a matter of contract construction, it is evident that the clause beginning with "other than" is exclusionary. Thus, if the employee committed the fraudulent or dishonest act motivated only by a desire to gain one of the enumerated financial benefits for himself or herself, the insured could not recover under the fidelity provision, as the requirements of subsection (b) would not be satisfied.

The district court held that the golden handcuff payments were not the type of financial benefits excluded under subsection (b) by adopting the following construction of the relevant language:

> It is clear that the uniquely final `one-time only' nature
> of these payments prevents them from being classified
> as bonuses `earned in the normal course of

51

employment.' F&D maintains that the clause precludes coverage for acts done with the intent to obtain any type of bonus, not just those earned in the normal course of business. Although grammatically the phrase `earned in the normal course of employment' modifies `other employee benefits,' it is at least unclear whether this clause intended to exclude coverage for dishonest acts committed with an intent to obtain a one-time payment such as the handcuff bonus in the context of the generic thrust of excluded types of remuneration. The litany of compensation kinds excluded from coverage are all payments which are generally received on a regular basis as part of an employee's compensation scheme. The handcuff payments certainly do not fall within that category.

Op. at 26. Invoking the well-settled principle that courts resolve ambiguities in an insurance contract in favor of coverage and construe exclusions narrowly, the court found that the clause did not bar coverage for dishonest or fraudulent acts committed with the manifest intent to obtain the handcuff payments.

In support of its construction of the exclusionary clause, F&D points out that "[c]ourts uniformly have construed the Bond's exclusion language for financial benefits to mean any payment that the insured voluntarily pays to an employee, even if those payments are fraudulently earned." Br. at 39. It explains that "[r]ecovery under a fidelity bond is barred if the employer `knowingly paid the disputed funds directly to the employees on the belief that the employees were entitled to the payments as compensation for honest work.' " Id. at 40 (quoting FDIC v. St. Paul Fire & Marine Ins. Co., 738 F. Supp. 1146, 1160 (M.D. Tenn. 1990), aff'd in relevant part, 942 F.2d 1032 (6th Cir. 1991)). F&D also points to Auburn Ford Lincoln Mercury, Inc. v. Universal Underwriters Insurance Co., 967 F. Supp. 475 (M.D. Ala.), aff'd, 130 F.3d 444 (11th Cir. 1997) (table), where the court rejected the insured's argument that the phrase "earned in the normal course of employment" permits coverage under subsection (b) if the commissions the employee earned from his conduct were not "earned in the normal course of employment" in the sense that they

52

were obtained fraudulently. See id. at 478-79 (noting that the phrase "in the normal course of employment" serves only to define the type of excluded benefits andfinding that "[t]his phrase does not mean that allegedly dishonestly obtained commissions are included within the policy").

We agree with F&D's argument that the district court erred in finding that the phrase "earned in the normal course of employment" could be construed as precluding the "one-time payments" provided for in the closing agreements. In this regard, we believe that the district court's construction of the last phrase of subsection (b) "`strain[s] the language of the policy tofind an ambiguity where there is none in order to grant coverage that does not exist.' " Oritani Savs. & Loan Ass'n v. Fidelity & Deposit Co., 989 F.2d 635, 639 (3d Cir. 1993) (citation omitted). In our view, the phrase "earned in the normal course of employment" is unambiguous, and thus, the presumption of construing the exclusion in the contract narrowly does not apply here. This conclusion compels us to find that the handcuff payments fall squarely within the definition of "bonuses" or "awards," or alternatively qualify as a type of benefit "earned in the normal course of employment." Accordingly, the RTC cannot satisfy subsection (b) by establishing that Ridder, Hurst and Merkle acted with the "manifest intent" of obtaining the golden handcuff payments for themselves.13

Our analysis begins with a review of the plain language of subsection (b). First, we note that the position of the phrase "earned in the normal course of employment" strongly indicates that that phrase was meant to modify the language "other employee benefits," as the modifying language directly follows that phrase and describes the types of employee benefits falling within the exclusion. See id.; Hartford Accident & Indem. Ins. Co. v. Washington

_____

13. Parenthetically, we observe that with respect to the $1,000 "bonus" DeVany received after the HonFed closing, there simply is insufficient evidence in the record concerning the nature and character of the payment for us to determine in this appeal whether it falls within the exclusionary language in subsection (b). Notably, the district court's opinion did not address that issue, and we expressly leave that question unresolved.

53

Nat'l Ins. Co., 638 F. Supp. 78, 83 (N.D. Ill. 1986) (quoting Berger v. Fireman's Am. Loss Control Co., No. 508, slip op. (Md. Ct. App. Dec. 16, 1982)). Moreover, as there is no comma between the two phrases, it is clear that they should be read together, so that the "earned in the normal course of employment" modifies only the general phrase "other employee benefits" rather than the other specific types of employee benefits previously enumerated. See Hartford Accident, 638 F. Supp. at 83. As one article explains:

> Attempts to limit the exclusion to financial benefits [such as salaries and commissions] earned in the normal course of employment have been rejected. The words `earned in the normal course of employment' do not modify the enumerated exclusions that precede them, but are intended to include in the list of excluded benefits other benefits typically earned by employees.

Foster, et al., supra at 789. Thus, under the plain language of the bond, the phrase "earned in the normal course of employment" cannot be viewed as a limitation on the exclusion. Rather, it is reasonable to conclude that the drafters included the phrase to provide a broader exclusion, thereby shrinking the bounds of coverage under thefidelity provision. This construction clearly undermines the district court's reliance on the last phrase of the exclusionary clause to conclude that the handcuff payments were not within the exclusion. See Hartford Accident, 638 F. Supp. at 83; see also Morgan, Olmstead, Kennedy & Gardner, Inc. v. Federal Ins. Co., 637 F. Supp. 973, 977 (S.D.N.Y.) (interpreting similar language and reaching same conclusion), aff'd, 833 F.2d 1003 (2d Cir. 1986) (table).

While recognizing that "earned in the normal course of employment" did not modify "bonuses" or"awards" per se, the district court found that language informative and demonstrative of the types of financial benefits that came within the exclusion. By relying on the phrase "earned in the normal course," its appears that the district court concluded that the one-time, final payments were not within the excluded financial benefits. The court's holding on this point thus rests upon its conclusion that the

unique, one-time nature of the payment distinguished it from the types of employee benefits set out in the exclusionary clause.

We cannot agree with the district court's reasoning. Put simply, a review of the case law interpreting the purpose of the exclusionary language and the meaning of the phrase "earned in the normal course of employment" demonstrates that the court's conclusion on this point is contrary to most (if not all) of the decisions addressing this issue. Extrapolating from the cases we have found on point, we understand the exclusion found in subsection (b) to eliminate coverage where the insured's theory is that the employee's purpose in engaging in the misconduct that caused the loss was to receive some type of financial benefit that, generally speaking, the insured provides knowingly to its employees as part of its compensation scheme and as a result of the employment relationship.14

(Text continued on page 57)

_____

14. See St. Paul Fire & Marine, 738 F. Supp. at 1160 (reviewing cases finding that coverage was precluded by the exclusionary clause, and noting that in each of them, "the employers [i.e., the insureds] knowingly paid the disputed funds directly to the employees on the belief that the employees were entitled to the payments as compensation for honest work"); see also Glusband, 892 F.2d at 210 (affirming judgment for insurer and noting that there was no evidence that the dishonest employee ever received any financial benefit other than salaries or commissions from insured, his employer, as a result of improper and speculative trading practices); Municipal Sec., Inc. v. Insurance Co. of N. Am., 829 F.2d 7, 9-10 (6th Cir. 1987) (affirming summary judgment for insurer where only evidence was that the employee obtained additional, unearned commissions from insured, her employer, as a result of improper conduct); Auburn Ford, 967 F. Supp. at 478 (same conclusion), aff'd 130 F.3d 444 (11th Cir. 1997) (table); Hartford Accident, 638 F. Supp. at 84 (stating that the last phrase "or other employee benefits earned in the normal course of employment" serves the useful purpose of distinguishing the entire list in part (b) from those financial benefits that, generally speaking, are "unearned" in the sense that they are not paid by the employer to the employee as part of the compensation scheme, but instead are obtained from payoffs, embezzlement schemes and other forms of theft); Verex Assurance, Inc. v. Gate City Mortgage Co., No. C-83-0506W, 1984 WL 2918, at **1-2 (D. Utah Dec. 4, 1984) (granting judgment to insurer because there was no evidence that employees intended to obtain a covered financial benefit; court noted

that the proofs indicated only that the loan officers decided to make loans to persons of questionable credit in order to collect commissions on the loans from their employer, the insured); Mortell v. Insurance Co. of N. Am., 458 N.E.2d 922, 929 (Ill. App. Ct. 1983) (finding that dishonest employees' only personal gain was improper commissions received from insured); Benchmark Crafters, Inc. v. Northwestern Nat'l Ins. Co., 363 N.W.2d 89, 91 (Minn. Ct. App. 1985) (stating that employee's four months of salary and benefits he received as an employee of the insured before the insured's discovery of the fraud did not provide basis for coverage); First Philson Bank, N.A. v. Hartford Fire Ins. Co., 727 A.2d 584, 590 (Pa. Super. Ct. 1999) (affirming summary judgment for insurer and holding that employee's receipt of shares of insured's stock through an employee stock option plan, along with various salary increases and bonuses from insured, constituted receipt of benefits "earned in the normal course of employment"), appeal denied, 1999 WL 1255735 (Pa. Dec. 27, 1999); Dickson v. State Farm Lloyds, 944 S.W.2d 666, 668 (Tex. App. 1997, no writ) (rejecting insured's coverage claim based on loss caused by employees' manipulation of time card system in order to obtain extra salary from insured); cf. James B. Lansing Sound, Inc. v. National Union Fire Ins. Co., 801 F.2d 1560, 1567 (9th Cir. 1986) (holding, in a suit for recovery on an employee dishonesty policy under which the insurer agreed to indemnify for loss of money, securities, or "other property" the insured sustained because of employee dishonesty, that the term "other property" did not permit the insured to recover commissions which it paid to an employee on fraudulent sales; court relied on language in dishonesty clause that excluded "commissions . . . or other benefits earned in the normal course of employment"); compare Lustig, 961 F.2d at 1167 (finding that district court erred in granting summary judgment to insured on issue of employee's manifest intent to obtain a covered financial benefit; in noting
that evidence of employee's intent was mixed, court nevertheless observed that the proofs indicated that the employee received a $40,000 "loan" from one of the bank's borrowers, ostensibly to show the borrower's good faith in an offer of future employment to employee); First Bank v. Hartford Underwriters Mut. Ins. Co., 997 F. Supp. 934, 937 (S.D. Ohio 1998) ("Courts have found indicia of manifest intent to obtain financial benefit outside the normal course of employment where an employee has a financial interest in the entity who benefits from the improper transaction."), aff'd on other grounds, 198 F.3d 245 (6th Cir. 1999) (table); Estate of K.O. Jordan v. Hartford Accident & Indem. Co., 844 P.2d 403, 413 (Wash. 1993) (en banc) (stating that employee obtained a financial benefit other than one "earned in the normal course of employment" when he embezzled trust funds and used them to cover

Following this approach, courts have explained that payments qualifying as "payoffs" or "kickbacks" fall outside the exclusionary clause, as well as financial benefits obtained as a result of the employee's interest in an entity that benefits from the improper transaction, because the payments in those instances clearly are not "salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment." See Lustig, 961 F.2d at 1167 ($40,000 "loan" from borrower to employee); First Bank v. Hartford Underwriters Mut. Ins. Co., 997 F. Supp. 934, 937–38 (S.D. Ohio 1998), aff'd on other grounds, 198 F.3d 245 (6th Cir. 1999) (table); Estate of K.O. Jordan v. Hartford Accident & Indem. Co., 844 P.2d 403, 413 (Wash. 1993) (en banc). Moreover, courts have rejected the argument that the exclusion precludes coverage only for losses caused by an employee's desire to obtain, for example, honestly earned commissions, finding that the term "earned" encompasses financial benefits both fraudulently obtained and honestly earned from the employer. See Municipal Sec., Inc. v. Insurance Co. of N. Am., 829 F.2d 7, 9–10 (6th Cir. 1987); Auburn Ford, 967 F. Supp. at 479; Mortell v. Insurance Co. of N. Am., 458 N.E.2d 922, 929 (Ill. App. Ct. 1983).

Thus, contrary to the district court's construction of the exclusion found in subsection (b), courts addressing its scope have held that the "earned in the course of employment" language is descriptive of the character of the payment at issue rather than the frequency with which the payment is received or the timing of its receipt. Indeed, this construction makes sense in view of the fact that each of the eight nouns preceding the last phrase "other employee benefits . . ." share the singular characteristic that they are all financial benefits provided knowingly by an insured, in its capacity as an employer, to its employees as a form of compensation and as a result of the employment relationship.

_____

operating expenses of company in which he was a shareholder, director, officer and employee).

57

We also point out that the very nature of bonuses and awards, both of which are excluded financial benefits under subsection (b), undermines the district court's limitation of the exclusion to only those payments received with frequency, or at a minimum more than once. Webster's Third New International Dictionary defines a "bonus" as "something given or received that is over and above what is expected." Id. at 252. Similarly, Webster's Seventh New Collegiate Dictionary defines an "award" as "something that is conferred or bestowed: prize." Id. at 61. Thus, if presented in the employment context, bonuses and awards are given by an employer to its employee as rewards based on job-related performance. By their very nature, those rewards are bestowed sparingly, perhaps only once in an employee's career. Nevertheless, under the plain language of the bond, a loss motivated by a desire to obtain such benefits falls squarely within the exclusion found in subsection (b).

Thus, we cannot agree with the district court's reasoning that the last phrase "earned in the normal course" indicates that the excluded benefits are limited to those forms of compensation that are given by the employer to the employee on a "regular basis." Rather, we hold that the exclusion covers payments knowingly made by the insured to the employee as a consequence of their employment relationship and in recognition of the employee's performance of job-related duties. Applying this standard here, we find that the golden handcuff payments fall squarely within the exclusion set forth in subsection (b), whether it be because they are considered a "bonus," "award," or simply a financial benefit that the employees "earned in the normal course of employment."

We point out that the closing agreements describe the payments thereunder as "compensation" for the employees' assistance in City Collateral sale, SA at 153, which suggests to us that the payments were bestowed once and only to certain employees in recognition of their job-related performance. We also note that the fact that the closing agreements provided for a singular, lump-sum payment actually supports the finding that the payments qualify as a bonus or award, given the ordinary meaning of those

58

terms. Moreover, these payments clearly are distinguishable
from the those financial benefits which have been held to
fall outside the category of excluded benefits, namely
payoffs or embezzled funds, as City Collateral voluntarily
signed the agreements knowing that the payments would
be made if the sale eventually occurred. Indeed, City
Federal paid the employees once the HonFed deal closed.
Compare St. Paul Fire & Marine, 738 F. Supp. at 1160-61;
Morgan, Olmstead, 637 F. Supp. at 978 (noting that bribes
would not qualify as "salary, commissions, fees or other
emoluments," which was the operative exclusionary
language).

Nevertheless, given our construction of the exclusion, it
appears that it would not preclude coverage under the
theory that Ridder, Hurst and Merkle engaged in dishonest
and fraudulent acts with the manifest intent to secure
future lucrative employment opportunities, salaries and
signing bonuses from HonFed--a third party to their
employment relationship with City Collateral.15 Indeed, F&D

_____

15. We point out in this regard that we have considered but rejected an
alternative construction of the language of the exclusionary clause--
namely that it would apply regardless of whether the employee obtained
the excluded financial benefits from the insured or a potential future
employer who is a third party to the insured/employee relationship. Not
surprisingly, we have been unable to find any cases addressing this
issue. We think it clear, however, that the exclusionary clause precludes
coverage only where the employee is motivated by a desire to obtain from
his or her current employer, i.e., the insured, the enumerated financial
benefits. See supra note 14. Such a construction is consistent with the
drafters' intent in limiting the types of risks that will be covered under
Insuring Agreement A. See generally Robin V. Weldy, A Survey of Recent
Changes in Financial Institutions Bonds, 12 Forum 895 (1977)
(describing dishonesty clause as covering losses resulting from a distinct
type of human failing, and excluding all other losses caused by
employees' "undesirable traits" from coverage):

> Certain types of financial benefit earned in the course of
> employment are not recognized. . . . In general, these benefits
would
> be those earned in the normal course of employment. For example,
> an incompetent employee earns a salary while concealing the nature
> and extent of his disastrous errors. Simple fear of unemployment is
> the undesirable trait here. It's not a covered peril. A head teller
in

apparently concedes that even under its construction of the exclusionary clause, which we found persuasive, benefits such as future employment, salaries and bonuses from HonFed would not fall within the exclusionary clause in subsection (b). Instead, it argues that the inference that the employees acted with the manifest intent to obtain different and more lucrative employment is "factually unsupportable" because it is undisputed that HonFed did not seek their employment with the company until November 1988. Thus, as we understand F&D's argument, it challenges the district court's assessment of the sufficiency of the RTC's evidence to survive summary judgment on this theory.

We disagree with F&D's argument that no reasonable jury could conclude, based on the evidence, that Ridder, Hurst, and Merkle acted with the purpose of obtaining for themselves more lucrative employment elsewhere, including large salaries and bonuses with the prospective purchaser. Indeed, we believe that a reasonable jury couldfind that these employees, in engaging in their course of concealment and misrepresentation, intended to secure employment bonuses and future employment with City Collateral's purchaser. As the district court noted, Hurst testified that the officers sought to " `maximize their rewards' in connection with the sales effort and targeted potential purchasers who would likely employ them after the transaction." Op. at 25. Put simply, the fact that Ridder, Hurst and Merkle did not learn until November 1988, that they in fact obtained what they had hoped for all along (in terms of lucrative employment, salaries and bonuses with the purchaser) is not logically inconsistent with the

_____

> a bank is promoted to loan officer and is aware that future promotions and raises are dependent on increasing loan activity. To increase loans and receive a normal financial benefit (raise and promotion) the loan officer ignores standing lending instructions and
> many loans go bad. Again, there is no covered loss in this situation.

Id. at 897. Indeed, it is apparent from this passage that the focus must be on the wrongdoer's status as an employee of the insured at the time of the dishonest conduct causing the loss. Thus, the relevant employment relationship is that of the insured and the employee, rather than the employee and a prospective employer.

60

proposition that they engaged in a course of concealment and misrepresentation prior to that date to secure that ultimate result.

We also point out that there is a suggestion in the record that as of late October or early November 1988, Ridder, Hurst and Merkle were confident that HonFed was going to purchase City Collateral, and that they began negotiating the terms of their future employment with the company around the same time period. In determining the employees' "manifest intent" to obtain future employment and signing bonuses, the jury certainly could consider the events that occurred subsequently to that date, in particular the December 9, 1988, memorandum to HonFed, and the fact that the individual defendants continued their course of concealment through the date of the sale. These events would be particularly probative on this issue, given the circumstance that as of that time frame, Ridder, Hurst and Merkle were certain to gain future employment, substantial salaries and signing bonuses if the sale occurred smoothly and on terms that were favorable to HonFed. In that sense, then, Merkle, Ridder and Hurst's chances for financial prosperity were tied to HonFed's ultimate success, which inevitably would come at City Federal's expense.

Accordingly, we hold that at trial, the RTC may seek to establish coverage under the bond by proving that in engaging in the various acts of concealment and misrepresentation, Ridder, Hurst, and Merkle acted with the purpose of securing for themselves lucrative employment opportunities, salaries and bonuses with City Collateral's eventual purchaser. However, it cannot seek to establish coverage by arguing that these employees acted with the intent to secure the golden handcuff payments from City Collateral, as those payments qualify asfinancial benefits falling within the exclusionary clause in subsection (b).

ii. Whether a reasonable jury could conclude that the individual defendants acted with a manifest intent to secure a financial benefit for a third party

We noted at the outset of our discussion that subsection (b) of the fidelity provision could be satisfied in two ways.

61

The second way that an insured could obtain coverage is if the loss resulted directly from the employee's desire to obtain a financial benefit for a third party, in this instance HonFed. F&D contended before the district court that it was illogical to assume that the individual defendants began their course of conduct in May 1988 with the manifest intent to benefit HonFed because HonFed did not come into the picture until November 1988, long after the individual employees allegedly began their dishonest and fraudulent conduct. The district court agreed with F&D's argument, holding as follows:

> In addition, no rational juror could find that the officers fraudulently concealed information from City Federal beginning in May 1988 with the manifest intent to benefit HonFed, a potential purchaser which only expressed interest in City Collateral months later. Although the December 9 memorandum was likely motivated by the desire to ensure that City Collateral passed to HonFed on favorable terms, the entire course of dishonesty and concealment perpetuated by the officers during the prior months cannot be attributed to this purpose.

Op. at 24.

The RTC does not challenge this ruling on appeal. For our purposes, we need not address whether the district court's analysis on this point was correct because we already have determined that the RTC may establish coverage under subsection (b) by proving that Ridder, Hurst, and Merkle acted with the manifest intent to secure future employment and bonuses with HonFed. Therefore, we will not disturb the district court's finding on this point.

c.      Whether there is sufficient evidence from which a reasonable jury could conclude that the employees acted with the manifest intent to cause City Federal to sustain a loss on the Northwest account (subsection (a)'s requirement)

F&D asserts alternatively that there is insufficient evidence from which a reasonable jury could conclude that the individual defendants acted with the manifest intent to cause City Federal to incur a loss on the Northwest

62

account. F&D points out that the quintessential example of an employee who undoubtedly possesses a manifest intent to cause the insured's loss is the embezzling employee-- "the thief"--because in that situation the employee's gain is always at the employer's expense. It contends that the only conclusion permitted by the evidence is that the employees hoped to save City Federal from large losses on the Northwest account. Accordingly, it asserts that we should affirm the district court's order of summary judgment because, as a matter of law, the evidence could not support the conclusion that the employees intended to cause City Federal's loss.

The district court found that there was a triable issue concerning the employees' manifest intent to injure City Federal, explaining that "the evidence supports an inference that the employees concealed the true problematic status of the Northwest credit line to induce City Federal to approve extensions of the credit line and to consent to the advancement of additional funds from April to December 1988." Op. at 22. Moreover, the court pointed out that the evidence demonstrated that the individual defendants, either individually or collectively, were well aware of the nature and severity of the problems with the credit line, yet took affirmative steps to misrepresent and conceal them from City Federal. Relying also on the other circumstantial evidence of intent, including the concealment of the Movroydis admission, the alteration of the customer history, and the advisory memorandum to HonFed on the eve of sale, the court found that a factfinder "could certainly conclude that the employees knew that the significant losses were `substantially certain to follow' from their conduct and that they acted with total disregard for these inevitable consequences." Id.

F&D contests the court's holding on two grounds. First, it contends that the district court's reasoning is unsound because "it makes no sense that the employees would cause [City Federal] to lose millions of dollars because that loss would assist the employees in obtaining thefinancial benefits." Br. at 48. It contends that "creating a loss would not have assisted the employees in receiving their bonuses from [City Federal.]" "If anything, and by the FDIC's own

63

admission, the Employees could have been terminated if they had been caught purposely creating a loss on the Northwest loan." See id. at 49.

Second, F&D argues that the district court ignored the undisputed evidence in the case demonstrating that the individual defendants extended the Northwest credit line beyond its initial maturity date in an attempt to minimize the losses that City Federal would incur. Moreover, F&D points out that the evidence also shows that over the course of the summer of 1988, the credit line showed some improvement, thus demonstrating that the employees acted solely with the best interests of City Federal in mind. In addressing the alleged acts of concealment, F&D contends that they do not undercut the other evidence of the employees' good intentions, as the RTC has failed to show how the employees intended to harm City Federal by hiding these problems. See id. at 49.

We have made a complete study of the record of this case to determine whether there is sufficient evidence from which a jury could conclude that Ridder, Hurst, and Merkle acted with the purpose or desire of causing City Federal to sustain a loss on the Northwest account. While we do not set forth at this point all of the evidence the RTC presented on this issue and explain our analysis of it, we are in complete agreement with the district court's ultimate conclusion that the circumstances present a genuine issue of material fact concerning their manifest intent to cause City Federal to sustain the Northwest loss. Given the unique facts of this case, there are many possible conclusions that could be drawn concerning the employees' purpose. For example, there is evidence tending to show that Ridder, Hurst and Merkle acted with the desire of benefitting themselves, and consequently also desired to cause City Federal's loss, inasmuch as City Federal's loss would inure to their benefit. Clearly, HonFed's last minute decision to exclude the Northwest account from the purchase was beneficial to them because it ensured that their new employer would not be saddled with the loss with which they arguably were involved on some level. On the other hand, the jury could conclude that the loss was the unfortunate result of a series of poor business decisions, or

64

that in seeking to obtain future employment and associated benefits with HonFed, Ridder, Hurst and Merkle only intended to benefit themselves and that the injury to City Federal was an unintended consequence. Moreover, we cannot discount the possibility that at some point, their motivation and desires changed. In any event, the evidence pertaining to the employees' intent is mixed, and coverage therefore is a disputed issue of fact that should be left for the jury. See Lustig, 961 F.2d at 1166-67.

Inasmuch as we have held that a jury may consider evidence tending to establish an employee's reckless behavior, as well as circumstantial proof of the substantial likelihood of a loss, and infer from those circumstances an intent to cause a loss, we believe that the facts of this case are such that a reasonable jury could draw the conclusion that the employees intended for City Federal to be saddled with the Northwest loan loss. Indeed, as we have explained, we simply cannot state with certainty what the employees intended in engaging in the acts that they did. Accordingly, we agree with the district court's ultimate conclusion that summary judgment on this issue was inappropriate.

We have considered in this regard F&D's argument that the district court ignored the circumstantial evidence supporting the conclusion that the employees' actions were not undertaken with the manifest intent to cause City Federal's loss on the Northwest account. To be sure, F&D is correct that a reasonable jury could conclude, based on certain evidence in the record, that the employees only hoped to save City Federal from incurring a substantial loss in connection with the overflow of shipped and warehoused loans. Nevertheless, there is other evidence in the record, namely the various acts of concealment, which supports the opposite conclusion. Put simply, a jury would be required to consider all of the evidence in reaching its ultimate finding regarding the employees' subjective intent in engaging in the conduct that they did, and we will not pretermit the jury's ability to do so.

Similarly, we have considered F&D's alternative argument, namely that "it makes no sense that the employees would cause [City Federal] to lose millions of dollars because that loss would assist the employees in

65

obtaining the financial benefits." Br. at 48. It claims that logically, if the individual defendants purposely created a loss on the Northwest account, it would not have benefitted them at all personally because it would be likely that City Federal would have fired them if it discovered that they purposely did so. In that event, Ridder, Hurst, and Merkle would not have been able to obtain lucrative employment with HonFed or collect on their closing agreements with City Collateral. See id.

This assertion does not persuade us that no reasonable jury could find that these employees acted with the manifest intent to cause City Federal to sustain a loss. First, we note that this argument, in essence, asks us to view the facts in the light most favorable to F&D, and draw subjective conclusions in its favor, a task that we cannot perform at this juncture. We believe, however, that F&D's contention is best left for the jury's consideration. We also point out that this argument is premised on F&D's assumption that the RTC's theory is that the individual defendants purposely "created" a loss on the Northwest account. But it seems clear to us that the RTC does not claim that individual defendants "created a loss" in the sense that they assisted Movroydis in his kiting scheme. Rather, the RTC's position is that the employees "caused" the loss to City Federal because their acts of concealment and various misrepresentations led HonFed to exclude the loan from the sale, which in turn resulted in City Federal being put in the unfavorable position of having to deal with a delinquent account that was certain to result in a significant loan loss. Inasmuch as subsection (a) of the fidelity provision requires only that the employees acted with the manifest intent "to cause" the insured to sustain the loss that it did, the RTC's theory of coverage falls squarely within its relatively narrow parameters.

In sum, we are convinced that the evidence is not so one-sided so as to compel the conclusion that, as a matter of law, Ridder, Hurst and Merkle did not intend to benefit themselves and cause City Federal to sustain a loss. Consequently, we will not disturb the district court's conclusion that summary judgment on this issue was inappropriate.

66

2. Whether there is a genuine issue of material fact as to whether the Northwest loss is a loss "resulting directly" from the employees' dishonest or fraudulent acts

As its final argument, F&D contends that the district court erred in concluding that a reasonable jury could find that the employees' misconduct caused the Northwest loan loss. The district court construed the causation language-- "resulting directly from"--as meaning that the bond covers losses that would not have occurred "but for" the dishonest conduct. See Op. at 23 (citing Lustig, 961 F.2d at 181 [sic]). The court found that the evidence was sufficient to survive F&D's summary judgment motion on this point because it suggested that the extensions of credit and the additional loans made after the original maturity date "at the very least enhanced the losses" City Federal suffered. Id. The court concluded that "while the deterioratingfinancial condition of Northwest and Movroydis's kiting scheme certainly contributed to the losses, a fact-finder could reasonably conclude that the concealment by the officers of the problematic status of the credit line in order to induce the approval of future loans and extensions directly resulted in a covered loss." Id.

F&D does not contend that the district court's "but for" standard was incorrect, but instead maintains that the RTC has not produced any evidence from which a reasonable jury could conclude that the employees' misconduct was the cause in fact of the loss, given the reality that it was likely that City Federal would have sustained the same or similar loss absent the fraudulent and dishonest actions. F&D asserts that, under general principles of tort law, an actor's conduct cannot be said to be a cause in fact of the resulting damage if the evidence shows that the injury would have resulted anyway even in the absence of the conduct at issue. In support of applying this rule to bar coverage in this case, F&D relies on tort cases discussing the concept that a plaintiff asserting a fraud claim must demonstrate that the fraudulent conduct caused an injury, and it analogizes to cases which held that there is no tort without an injury. See id. at 56 (citing Midwest Commerce Banking Co. v. Elkhart City Ctr., 4 F.3d 521, 524-25 (7th Cir. 1993); Stromberger v. 3M Co., 990 F.2d 974, 976-77

67

(7th Cir. 1993); Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496 (2d Cir. 1992); Schroth v. Coal Operators Cas. Co., 73 A.2d 67, 68 (N.J. Super. Ct. App. Div. 1950)).

From this premise, F&D argues that the RTC failed to meet its evidentiary burden at summary judgment because it did not introduce any evidence tending to show that, absent the individual defendants' pattern of concealment and misrepresentation, City Federal would have avoided the loss on the Northwest account. Br. at 55-63. F&D points to the fact that the RTC's expert could not quantify with a reasonable degree of certainty what funds were available to pay off the advances outstanding on the Northwest loan at any particular time. F&D's argument thus is premised on its belief that the district court's factual cause or "but for" analysis was flawed in that no reasonable jury could conclude that the employees' dishonest or fraudulent conduct played any part in the loan loss that forms the basis of the RTC's indemnification claim.

Our analysis of this issue must begin by determining the appropriate causation standard, given the plain language of the bond. That finding will permit us to consider whether the evidence in record is sufficient to establish that there is a jury issue on causation.

As to the first issue, we do not share F&D's view that the phrase "losses resulting directly from" requires only an inquiry into the factual cause of the loss. Indeed, it appears that in assuming that the language "resulting directly from" requires only a "but for" or "cause-in-fact" standard of causation, F&D has not considered our opinion in Jefferson Bank v. Progressive Casualty Insurance Co., 965 F.2d 1274 (3d Cir. 1992), which addressed the appropriate construction of the identical phrase under Pennsylvania law. There we construed the "resulting directly from" causation language in Insuring Agreement E--the forgery provision--and concluded that that phrase meant"losses proximately caused by." See id. at 1280-81. In reaching our conclusion, we specifically noted the insured's argument that the bond's language indicated that the causation standard was "broader" than proximate cause, and that the standard was a more lenient one, requiring only that the forgery be the "cause-in-fact" or the "but-for" cause of the

68

loss. See id. at 1280–81 & n.10. Our analysis rejected the insured's broader construction, as we found that the conventional proximate cause standard was the correct formulation. We also rejected the insurer's argument that the language of the bond required the plaintiff to prove not only proximate cause, but also some additional closeness in space and time between the loss and the cause of the loss. See id. at 1280–81 & n.11.

Our research reveals that the New Jersey Supreme Court has not addressed the meaning of the phrase "losses resulting directly from" as it is used throughout the various Insuring Agreements contained in the Standard Form No. 22 bond at issue in this case, and in particular has not construed the meaning of that language as it is used in the fidelity provision. Nevertheless, our review of several New Jersey cases interpreting and applying similar causation language in other types of insurance agreements indicates to us that the New Jersey Supreme Court would follow our opinion in Jefferson Bank and apply the proximate causation standard to the "resulting directly from" language found in the fidelity provision of this bond. See, e.g., Cruz–Mendez v. ISU/Ins. Servs., 722 A.2d 515, 525 (N.J. 1999) (stating that statute, in using the terms "caused" and "by reason of," contemplates proof of proximate causation) (citing Westchester Fire Ins. Co. v. Continental Ins. Cos., 312 A.2d 664, 669 (N.J. Super. Ct. App. Div. 1973), aff'd, 319 A.2d 732 (N.J. 1974) (per curiam), which observed that phrases "caused by" and "resulting from" in insurance contracts convey idea of proximate cause); Search EDP, Inc. v. American Home Assurance Co., 632 A.2d 286, 289–90 (N.J. Super. Ct. App. Div. 1993) (applying proximate cause standard where errors and omissions policy covered damages "resulting from" wrongful act where wrongful act "arises out of" conduct of insured's business) (citing Franklin Pack'g Co. v. California Union Ins. Co., 408 A.2d 448 (N.J. Super. Ct. App. Div. 1979)); Stone v. Royal Ins. Co., 511 A.2d 717, 719–20 (N.J. Super. Ct. App. Div. 1986) (interpreting language describing coverages and exclusions under homeowner's insurance policy where policy covered "direct loss . . . caused by," inter alia, accidental discharge or overflow of water, and excluded losses "directly or indirectly from" water damage; court applied proximate

69

cause standard to determine if water damage was covered by policy, and determined that last event contributing to the damage--the ruptured hose on the sump pump--was a covered risk); see generally Karadontes v. Continental Ins. Co., 354 A.2d 696, 697 n.1 (Bergen County Dist. Ct. 1976) (noting that "direct loss" as used in fire insurance policies has been construed to have essentially the same meaning as proximate cause); Stephen M. Brent, Annotation, What Constitutes "Direct Loss" Under Windstorm Insurance Coverage, 65 ALR 3d 1128 (1975) (noting that courts have equated "direct result" with "proximate cause of loss"); 7 Couch 3d, supra S 101:53 ("The term `direct loss' is generally held to be the equivalent of both `proximate cause,' and `direct cause.' ") (citations omitted).

Indeed, our result in Jefferson Bank was predicated upon our review of Pennsylvania case law addressing the meaning of a similar causation standard utilized in a different type of insurance contract, see Jefferson Bank, 965 F.2d at 1281, and our construction of the language "losses resulting directly from" comports with other jurisdictions addressing this issue in the fidelity insurance context. See, e.g., Mid-America Bank v. American Cas. Co., 745 F. Supp. 1480, 1485 (D. Minn. 1990) (utilizing proximate cause principles in addressing defendant's argument that the losses caused by the renewal of loans are not losses "directly resulting from" the employee's dishonest or fraudulent acts); Hanson PLC, 794 P.2d at 73 (stating that trial court did not err in instructing jury that "result directly" language in fidelity bond may be defined as proximate cause). But see Fidelity & Deposit Co., 45 F.3d at 976 ("Lustig requires that the FDIC show that a loan would not have been made `but for' the fraudulent conduct of the employee."); Lustig, 961 F.2d at 1167 ("A loss is directly caused by the dishonest or fraudulent act within the meaning of the bond where the bank can demonstrate that it would not have made the loan in the absence of fraud."); see generally William T. Bogaert, Andrew F. Caplan, Computing the Amount of Compensable Loss under the Financial Institution Bond, 33 Tort & Ins. L.J. 807, 813-14 & nn.29 & 33 (Spring 1998) (criticizing approach in Jefferson Bank as adopting causation standard that was too lenient given the plain language of bond which required

70

that the connection between the loss and the conduct be "direct," and noting still that the Court of Appeals for the Fifth Circuit's approach in Lustig "departed even further from the contractual language by allowing recovery based upon mere `but for' or factual causation in apparent disregard of the direct loss requirement and the proximity of the covered conduct and the loss").

Thus, as a matter of logic, we see no reason why the New Jersey Supreme Court would adopt a different interpretation of the language, given the fact that the phrases in the two Insuring Agreements are identical, and our reasoning in Jefferson Bank supports an application of the proximate causation standard in this context. Accordingly, we hold, in accordance with our reasoning in Jefferson Bank, that the phrase "losses resulting directly from" requires, for purposes of indemnification, that the losses be "proximately caused by" the fraudulent or dishonest acts of the employee which form the basis for the insured's coverage claim.

As previously mentioned, the district court, following Lustig, held that there was evidence suggesting that the dishonest and fraudulent acts were the cause in fact of the Northwest loan loss. The court stated that there was evidence suggesting that the extensions and additional loans, at the very least, "enhanced" the losses City Federal suffered. Op. at 23. Thus, it appears from the language it used that the district court applied a less-demanding standard of causation than that which we have adopted today. See Jefferson Bank, 965 F.2d at 1281 n.10.

Nevertheless, we do not believe that the district court's error in this regard necessitates reversal of the district court's conclusion that there were genuine issues of material fact concerning the question of causation presented on the facts of this case. Indeed, we agree with the district court's ultimate finding that a jury must determine the cause of the Northwest loss that City Federal sustained, and in particular, whether those specific dishonest and fraudulent acts upon which the RTC bases its claim of indemnification proximately caused the loss. Under New Jersey tort law, which we find instructive on the proximate cause analysis required under the bond, see

71

Jefferson Bank, 965 F.2d at 1281, "a proximate cause need not be the sole cause of harm. It suffices if it is a substantial contributing factor to the harm suffered." Perez v. Wyeth Labs. Inc., 734 A.2d 1245, 1261 (N.J. 1999); see also Jefferson Bank, 965 F.2d at 1281 (stating that under Pennsylvania law, a cause is proximate if it is merely a substantial cause of the harm) (citations and quotation marks omitted). Based on the record before us, we cannot find, as a matter of law, that a jury could not conclude that the employees' actions were a substantial factor in bringing about the Northwest loan loss that eventually resulted. Allowing the jury to decide the issue of proximate cause is consistent with New Jersey's approach to resolving causation issues. See Perez, 734 A.2d at 1261 (citing Martin v. Bengue, Inc., 136 A.2d 626 (N.J. 1957)).

We further point out that in reaching our conclusion on the causation issue, we are unpersuaded by F&D's suggestion that as the non-movant at summary judgment proceedings, the RTC had to produce evidence demonstrating that the Northwest loan loss would have been avoided if the employees' misconduct had not occurred. Importantly, F&D's position in this regard is premised on cases which are not on point factually and fail to address the relevant legal concept here--that of proximate causation. Indeed, it appears from its brief that F&D's argument conflates the tort concepts of proximate causation and lack of compensable injury. See Br. at 56-59 (citing Midwest, 4 F.3d at 524; Stromberger, 990 F.2d at 976-77; Citibank, 968 F.2d at 1495; W. Page Keeton et al., Prosser and Keeton on the Law of Torts S 41, at 265 (5th ed. 1984)). Given this analytical flaw, F&D has not persuaded us that the facts pertaining to the issue of proximate causation are so one-sided so as to require judgment as a matter of law in its favor. See Jefferson Bank , 965 F.2d at 1285 (finding genuine issue of material fact concerning whether forged signature proximately caused loss where the evidence suggested that the bank would have refused to enter the transaction had not an individual purporting to be a notary signed the instrument); accord Lustig, 961 F.2d at 1167-68 (finding that relevant question pertaining to causation issue was whether "the loan committee relied on [the employee's] misrepresentations in making at least some

72

of the disputed loans," and determined that there were material disputed issues of fact on that point; court stated that the bond "does not require the bank to rule out all reasons the loan was not repaid before it can obtain coverage"). Accordingly, we will affirm the district court's ruling on the causation issue, as we see no basis for concluding, as a matter of law, that the dishonest and fraudulent actions did not cause the Northwest loss.

## V. CONCLUSION

As the foregoing discussion demonstrates, we have determined that the district court erred in determining that no reasonable jury could conclude that City Federal "discovered" the covered loss prior to the expiration of the bond period. Moreover, for the reasons stated, we cannot affirm on the alternative ground that, as a matter of law, the loss City Federal sustained was not covered by the plain language of the bond's fidelity provision. Accordingly, we will reverse the district court's order entered January 29, 1998, and remand the matter to the district court for further proceedings consistent with this opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

73